IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Erin Olson,

        Plaintiff,

        vs.                Case No. 12-2084-JTM

Shawnee County Board of
Commissioners,

        Defendant.

MEMORANDUM AND ORDER

        Plaintiff Erin Olson brings the present claim against the defendant Shawnee of

County Board of Commissioners, alleging that the defendant violated Title VII of the Civil

Rights Act by various actions of the Shawnee County Sheriff during her employment as a

civilian with that office. The defendant has moved for summary judgment, and following

a review of the evidence, the court finds that the motion should be granted.[1]

        Summary judgment is proper where the pleadings, depositions, answers to

---

[1] In addition to the lengthy pleadings relating to the defendant's Motion for Summary Judgment, Olson has filed a separate Motion for Partial Summary Judgment (Dkt. 131), which seeks to dismiss the defendant's affirmative defense mentioned in its Answer alleging ""Plaintiff caused her own claimed damages and/or failed to mitigate her claimed damages." (Dkt. 4, ¶ 101). The plaintiff's motion otherwise adds nothing substantial to the evidence that is already before the court as the result of the defendant's motion.

        The defendant clarifies in its response, that by the cited language in the Answer, it simply sought to present the defense that Olson's reprimands and eventual termination were the consequence of her own conduct, coupled with the denial that the actions of the Sheriff or the County caused any damage to her. That is, the defendant "is not contending that Plaintiff failed to mitigate her damages in not seeking employment after she was terminated." (Dkt. 135, at 2). Given the determination that the defendant is otherwise entitled to summary judgment on the merits of Olson's claim, it need not resolve the contours of the "affirmative defense" targeted by Olson's motion.

interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The court does not include as findings of fact arguments by counsel, factual assertions which are unaccompanied by direct citation to evidence in the record, or events which have no material relevance to the issues at hand.

*Findings of Fact*

*The Sheriff's Office*

Richard Barta became Sheriff of Shawnee County, Kansas in March 2000. He retired in April, 2012. As the Sheriff, Barta was the appointing authority for his office, making all personnel decisions. Any promotion or status change required his approval. He also had the power to institute and veto general orders.

The Shawnee County Human Resources Policy Manual applies to the Sheriff's Office. Policy 9.0 of that manual sets forth a policy of progressive discipline, which applies to classified employees, and to union members, to the extent that their Memorandum of Understanding (MOU) is otherwise silent. This policy "involves four (4) steps of progressive discipline for infractions of a similar nature and which are of a nature not serious enough to constitute just cause for immediate suspension or discharge." The four steps of progressive discipline are:

A. First Offense – Documented Verbal Reprimand
B. Second Offense – Written Reprimand
C. Third Offense – Suspension
D. Fourth Offenses – Termination

The steps are "intended to serve as a warning to the employee that their behavior needs to improve in the specified area and that repeated incidents may result in additional discipline up to and including termination."

In some cases, the progressive discipline policy may not be used. Section 9.3 provides: "The level of discipline to be applied is at the sole discretion of the appointing authority and need not be progressive in nature if the situation warrants." Thus, the decision maker may skip a step or all of the steps according to the severity of the violation.

The manual provides that all disciplinary actions are subject to a grievance procedure.

The Shawnee County Human Resources Department (HRD) keeps the records for

all county employees. This includes the employee's Personnel Status Change Form, which tracks position, pay, and status. Supervisors and the HRD fill out a Change Form whenever an employee receives a new position, promotion, raise, or other change in his employment.

### The Accreditation and Training Unit

Sheriff Barta decided to obtain accreditation from the Commission on Accreditation for Law Enforcement Agencies (CALEA). This accreditation requires passing an on-site CALEA assessment. An applicant agency must prove that its standards are in compliance with those of CALEA. The Sheriff's Office first received a CALEA accreditation in 2004. Since that time, Sheriff Barta has appointed Lieutenant Scott Gilchrist, Sergeant Steve Luttjohann, and Sergeant Justin Vest to serve as Accreditation and Training Unit (ATU) Accreditation Managers. Luttjohann and Vest were Accreditation Managers during Olson's employment.

Luttjohann was hired to work for the Sheriff's Office in August 1993. Before that, he had served four years in the United States Marine Corps, and attained an Associate of Arts Degree in Criminal Justice from Washburn University. In addition to the ATU, Luttjohann worked in the Patrol Division, Fugitive Warrants division, and the Civil Process Division.

Vest has been employed at the Sheriff's Office since May 2002. He had a Bachelor's of Science degree in Criminal Justice from Washburn University, and later obtained a Masters of Criminal Justice. Vest has worked in the Patrol Division, the Operations Division, and the ATU.

When Luttjohann and Vest were hired, each had to attend Kansas Law Enforcement Training Center (KLETC) training and comply with its training requirements. They were also Fraternal Order of Police (FOP) members.

Shawnee County and the FOP have entered into a MOU which governs the terms and conditions of union members' employment. MOU Section 12.0 governs the salary for

union members, and ties their pay to the FOP Wage scale. Thus, the pay of both Luttjohann and Vest was determined under that scale, which is based wholly on rank and years of service. When he began working in the ATU, Vest was paid $25.08 per hour. In 2009, Luttjohann was paid $27.15. In December of 2010, this increased to $27.80 per hour.

Luttjohann and Vest had training duties in addition to their work as Accreditation Managers. They developed and ran the Agency's in-service program, maintained training records, and monitored each deputy's continuing education record for compliance.

Luttjohann and Vest were also assigned Sheriff's Office vehicles, which each drove to and from work and in performing various job related responsibilities. Both were expected to insure that the vehicle was always well-maintained and in working order. Under MOU Section 13.9, an Officer with an assigned vehicle is required to respond to an emergency calls. In addition, as drivers of marked vehicles, Luttjohann and Vest were obligated to stop any time they saw an emergency requiring immediate attention.

While working in the ATU, Luttjohann and Vest responded to various emergency calls. From December 1, 2009 through July 29, 2010, Luttjohann was responded to a non-injury auto-accident; five traffic hazards; a report of a stolen vehicle; a report of an injured animal; a report of a theft; and received information during that time. From August 2010 through May 2011, Vest responded to a service request; five reports of suspicious vehicles; a report of a prowler; a non-injury auto accident; an injury automobile accident; picked up a prisoner; received information; and performed a traffic stop.

Olson has acknowledged that Luttjohann was a Law Enforcement Officer, and he had legal duties associated with that position:

Q. You agree that Luttjohann was a certified law enforcement officer?
A. He was a certified law enforcement officer.
Q. That as a certified law enforcement officer, Luttjohann may have other duties that he would need to legally perform in that capacity beyond that of an Accreditation Manager, true?
A. I would say that he under the scope of the law had the responsibility to

5

perform those when necessary.

. . . .

A. I am comparing myself to him in the fact that we did equal job duties when he was at -- when he was in that position. We did equal work.

Q. But he had additional responsibilities, true?

A. I would say that under the scope of the law he could perform those other duties.

Q. So are you saying then -- are you agreeing that under the scope of the law, he had those additional duties, he was legally required to do them?

A. If he was legally required to do them, then, yes, he was supposed to do them.

Luttjohann and Sgt. Vest were each issued a firearm. They were expected to be fully trained on the use of their issued firearms and to properly maintain the firearms in operating condition.

Olson testified that she did not use the equipment associated with the duties of an Officer:

Q. Use of firearms, weapons, patrol car, two-way radio, miscellaneous law enforcement equipment, miscellaneous vehicle equipment, those are all items that aren't listed on your job description that you proposed to Sheriff Barta in January 2010, correct?

A. I wasn't required to use that equipment.

Both Luttjohann and Vest were expected to wear a full Sheriff's Office uniform to work daily. The job description Luttjohann signed for the position of Accreditation Manager contained a "minimum qualifications" requirement of five years' experience as a deputy with the Sheriff's Office. Olson admits she did not meet this requirement:

Q. Under the minimum qualifications in Sergeant Luttjohann's job description, it indicates he has to have five years' experience as deputy with the Shawnee County Sheriff's Office?

A. I see that minimum requirement.

Q. There was no such minimum requirement in the job description that you proposed to Sheriff Barta, correct?

A. That's correct.

Q. If there was such a job description, you would not qualify for it, would you?

A. If there was that requirement in the one that I drafted, then, no, I would

not have qualified based on that, that minimum qualification.

### Olson's Employment

On November 30, 2007, Olson received a letter from Sheriff Barta offering her employment as an Office Assistant II in the Training Division. She began working in that position on January 2, 2008, earning $9.71 per hour, and was assigned to the ATU.

Prior to her employment, Olson had never been trained or certified as a law enforcement officer. She understood the training necessary to become a Certified Sworn Law Enforcement Officer required weeks of training at KLETC, and as least 40 hours of in-service training each year. Law Enforcement Officers must take an Oath to uphold the Constitution and Laws of the United States and the Constitution and Laws of the State of Kansas.

Olson was never a Law Enforcement Officer at any time. She was never required to attend the necessary training, and never signed any oath as a Law Enforcement Officer. She testified that, in her employment, "I did not do law enforcement work."

As an Office Assistant II, Olson was employed under the Teamsters contract, and her wages were based on that contract. She understood that wage increases under the union contract were governed by time of service.

Shawnee County permanent employees generally receive Performance Evaluations annually, and more frequently during initial probationary periods. Olson received five Performance Evaluations. These were consistently favorable, and each of Plaintiff's evaluations had an overall rating of "Acceptable."

When Olson began her employment, her chain of command was Sgt. Luttjohann, Lieutenant John Ostenson, Captain Lance Royer, Undersheriff Scott Holladay, and Sheriff Barta. Luttjohann and Ostenson were the individuals Olson directly worked for and answered to from the time she began her employment in January 2008 through the end of

her probationary period on April 30, 2008.

On April 24, 2008, Olson received a letter from Sheriff Barta stating that she had completed her probationary period of employment and would be permanently assigned to the ATU effective April 30, 2008. A Personnel Status Change Form with an effective date of May 1, 2008, indicates that Olson's probation was complete.

Plaintiff described her job duties upon completing her probationary period as follows:

A. I primarily helped with accreditation.

Q. And when you say that, what's that mean to somebody walking on the street? How would you describe in greater detail than primarily helped with accreditation?

A. I helped with proof collecting or generate different reports, a lot of clerical work, a lot of highlighting, a lot of copying. I helped with the distribution of proof needed at the time. That was -- that would have been it.

At some point after her probationary period, Lt. Ostenson and Sgt. Luttjohann discussed with Olson a way to get her out of the clerical workers' union scale agreement and about the possibility of moving her to more of an Assistant Accreditation role. They told Olson they were interested in creating an Assistant Accreditation Manager Position and wanted her to fill it. They asked Olson if she was interested. The position would give her a little bit more responsibility and would make it easier to collect her documentation.

Olson testified that Luttjohann and Ostenson "were going to have to work with the command staff on that." This would include the creation of a job description, which is required by County policy. Olson reviewed drafts of the proposed job description given to her by Luttjohann, and she had an opportunity to review the proposed description before it was submitted up the chain of command. Olson understood "the command staff" to be the Captains, Undersheriff, and Sheriff. She also believed Michael George, the Sheriff's legal counsel, would have been included in the command staff.

On September 26, 2008, Sheriff Barta issued a memo to Rich Davis at HR, regarding

the Assistant Accreditation Manager position. Shortly thereafter, Michael George sent an e-mail to Pat Kirkman with the Teamsters about the position. On October 14, 2008, a Shawnee County personnel requisition was issued for the Assistant Accreditation Manager. The position was created as a classified position, meaning the Assistant Accreditation Manager had due process rights afforded her through the Policy Manual.

Olson testified:

> Q. But at some point in time, did you learn or were told that the position of Assistant Accreditation Manager had been approved and that there was now an official position with the HR department of Shawnee County Sheriff's Department?
>
> A. I was told that the HR had essentially opened the position and I had to reapply for the position.
>
> Q. So you knew HR had to get involved?
>
> A. Yeah, I knew HR had to get involved.

Olson applied for the opening, and was appointed to the position on October 29, 2008. A November 1, 2008 Change Form reflects the change in Olson's employment with the Sheriff's Office. Olson admits the Change Form is an HR record which evidences her title, job position, and employment with Shawnee County.

When she was promoted, Olson's hourly pay increased from $9.71 to $12.57. A December 20, 2008 Change Form lists Olson as Assistant Accreditation Manager, documents a pay increase to $12.83. The reason for the change in pay was a scale increase.

Olson received favorable evaluations from Luttjohann during her employment. Lt. Ostenson considered her "very bright."

On December 22, 2008, Olson executed a position description for the Assistant Accreditation Manager position. The position description was also signed by Lt. Ostenson and Sheriff Barta.

On the potential for pay increases, Olson testified:

> Q. What was your understanding as to what potential you had for pay increases as you continued your employment as Assistant Accreditation Manager for the Shawnee County Sheriff's Department?

A. My understanding was it worked kind of like the union contracts and the longer that you were there, you got -- you kind of moved up the steps.

Q. So it would be step increases or pay based upon years of service?

A. That was my understanding.

On November 1, 2010, Olson's pay increased to $13.48 per hour.

While attending a CALEA conference in March 2009, Sheriff Barta told Lt. Ostenson he was interested in making a civilian the Accreditation Manager. Barta hoped that this would "free up" uniformed officers for other areas. Barta did not take any formal action to place Olson or any other civilian in the Accreditation Manager position in 2009.

### *Alleged Promotion to Manager*

Olson has testified that in April 2009 she spoke with Ostenson and Luttjohann about her becoming the Accreditation Manager. In 2009, Luttjohann listed Accreditation Manager as Olson's title in his Performance Evaluation. He testified that the title was not official, and he had essentially given her that title.

Olson contends that she was told, by Luttjohann, that she was Accreditation Manger in 2009. She was also performing "the vast majority" of the tasks in the Accreditation Unit.

At the same time, Olson has acknowledged that she knew that a civilian had never been Accreditation Manager. She has also acknowledged that she has no documentation supporting any 2009 promotion:

Q. Is there any kind of document that you have from Lieutenant Ostenson regarding a proposed promotion to the Accreditation Manager position in April of 2009?

A. They were verbal conversations.

Q. So the question -- my question is: Is there any document that reflects in April of 2009 you were promoted to the position of Accreditation Manager?

A. I don't believe there's a document dated in April of '09.

Q. Is there a document that was filed with your personnel file with the Human Resources Department of Shawnee County reflecting that in April of 2009 you were promoted to the position of Accreditation

Manager?

A. There's no document dated in April of '09.

Q. In the personnel file that you are aware of that Human Resources has for Shawnee County?

A. That's correct.

....

Q. Did you in April of 2009 receive correspondence from Sheriff Barta similar to the correspondence you received when you were appointed as the Assistant Accreditation Manager appointing you as the Accreditation Manager?

A. There was never a formal letter sent.

A November 1, 2009 HR Change Form, which reflects a pay increase to $13.15, states that Olson's job title was Assistant Accreditation Manager.

Olson acknowledged that as of August 2009, there was no official Shawnee County position description for a Civilian Accreditation Manager position:

Q. So at least based upon the time frame that you have set out in your Complaint as of August 2009, we can agree that there was no official job description for a Civilian Accreditation Manager with the Shawnee County Sheriff's Department, correct?

A. At that time, I do not recall an actual position description for a Civilian Accreditation Manager.

Q. So we can agree at that there was no official job description for a Civilian Accreditation Manager with the Shawnee County Sheriff's Department as of August 2009, correct?

A. I would -- I would generally agree with you on that.

Q. You would generally agree with me on that?

A. I would agree. I'm sorry.

In late summer or early fall of 2009, Olson realized that her position had never been formalized. She then began drafting a job description for a Civilian Accreditation Manager position. In her deposition, Olson testified that this job description was "very similar" to the job description for her existing Assistant Accreditation Manager position.

Q. You'd have to look at it fairly closely to [see] that you added delegate and monitor accreditation activities to the proposed job description. You added make oral and written presentations to the proposed job description and you added collect accurately, report correctly and correctly disseminate information?

11

A. Those are a couple of the changes that I noticed between the two.

Q. And then you add under skill, you added providing leadership and direction to employees.

A. Yes, that's changes I see.

....

Q. .... If you compare the proposed job description that you submitted to Sheriff Barta in January of 2010 to your original job description as an Assistant Accreditation Manager, on Page 3, everything on Page 3 is essentially identical, isn't it?

A. I remember seeking some input on this and I was told to pretty much keep it the same, that nothing had really changed. I was doing significantly more scanning, so like the equipment used I added my scanner. It was used at least on a weekly basis. I can't say daily basis, but at least on a weekly basis I would have used it.

Q. That's the only change in Page 3, a difference between those two job descriptions, correct?

A. As I glance at them, yes, that looks like -- that looks like probably the only change.

On January 20, 2010, Olson drafted a Memorandum to Sheriff Barta, asking approval for her proposed Civilian Accreditation Manager Job Description, as well as a pay increase. She sent the Memorandum to her chain of command before it was submitted to Sheriff Barta.

On January 21, 2010, Captain Shane Hoobler and Lt. Ostenson met with Olson to provide feedback on the Memorandum before giving it to the Sheriff. They also stated that Olson should not have referred in her memo to alleged deficiencies in training hours, as this was a "housekeeping issue" and appeared disrespectful to Luttjohann, whose job it was to enter the training hours. Hoobler and Ostenson also felt that the statement in Olson's memo that she had developed a "proof matrix" used at the Unit was misleading. Olson had adapted a Riley County process for use by Shawnee County; she had not created or developed it solely by herself.

Olson contends that Hoobler told her she should submit her memo through the chain of command to avoid negative ramifications. Hoobler denies that he said this, only that he felt the memo was wrong in its tone and intent. Hoobler has testified that he wanted

to give Olson feedback to "make sure that the presentation was done in a favorable manner to her."

After the meeting, Olson gave the Memorandum to Sheriff Barta. In her Memorandum, Olson acknowledged, "Our agency has never had a Civilian Accreditation Manager before, and therefore we needed to create a job description for such a position."

Sheriff Barta testified about his response:

Q. Okay. Now, you said that you had some second thoughts. So you said, well, Erin Olson is not the accreditation manager?

A. No. If I did, I need to clarify that.

Q. Okay.

A. It seems to me I received some correspondence that Ms. Olson was the accreditation manager.

Q. Right.

A. That's when I said, no, Ms. Olson is not the accreditation manager; Sergeant Luttjohann is and Lieutenant Ostenson oversees that. I know we have had conversations in the past that I would like to see a civilian accreditation manager but up to this point I have not in any way assigned a civilian accreditation manager to our accreditation unit.

....

A. I made it very clear to my senior staff that when I got that letter, Ms. Olson was not the accreditation manager and that needs to be made very clear to rank and file now that I became aware of it. That being said –

Q. I'm sorry. I don't want to interrupt you. But when did you say that?

A. It would have been some time after I received her letter saying that she was the accreditation manager.

On January 26, 2010, Hoobler sent a memo to Sheriff Barta stating that he did not believe Olson should be promoted, as her duties had not changed since she had been made Acting Accreditation Manager.

On January 28, 2010, Olson met with Ostenson and Luttjohann. There is no evidence who actually called the meeting, but Ostenson and Luttjohann told Olson she was not the Accreditation Manager and her title was still the Assistant Accreditation Manager. Olson disagreed that she was not the Accreditation Manager.

Olson claims that she was thus demoted, but there is no evidence that she was ever

formally or officially promoted to Accreditation Manager as opposed to an acting Accreditation Manager. Rather, the evidence indicates that Olson was informally designated as Accreditation Manager by her immediate superior Luttjohann, and the evidence does not show that he had the authority to make such appoints. Rather, the evidence is that only the Sheriff has such authority. Here, Sheriff Barta determined that Olson, to the extent she was acting as Accreditation Manager, should no longer do so.

Olson admits that Luttjohann and Ostenson told her that, while they had been flexible about her late arrivals in the past, she needed to arrive at work on time. She also admitted that gender was not a factor in the January 28, 2010 meeting.

Barta believed that the job of the Accreditation Manager could be performed by a civilian, and did not need to be a law enforcement officer. He met with Undersheriff Holladay, Michael George, Bob Moser, Capt. Hoobler, Lt. Ostenson, Sgt. Luttjohann, and Olson about Olson being elevated to Accreditation Manager.

On February 15, 2010, Barta sent Olson a Memorandum declaring his intention to make "organizational adjustments" and place her in the position of Accreditation Manager. This Memorandum further indicated Olson would receive a pay raise once the Sheriff had the opportunity to evaluate the change.

### The Union Objects

The MOU provides the FOP with a grievance procedure under Section 34. A grievance, pursuant to the MOU, is a complaint "involving the interpretation or application of any provision contained within this Agreement."

The FOP acts to protect the interests of its members by bargaining collectively with the County and, when necessary, filing grievances under the MOU. The union views securing and preserving opportunities for promotion as a component of protecting its membership.

Section 42.18 of the MOU provides:

*Civilian Employees*. The Sheriff may, without meeting and conferring with the F.O.P., hire no more than two (2) civilians as specified below to perform the duties set out below which are currently being performed by officer. No officers will be displaced from their current positions to accomplish this. Civilian personnel, assigned to perform those tasks normally performed by officers, will be supervised by Sheriff Officers. Non Civil Service Sheriff's Office employees shall not be allowed to volunteer time to perform any duties normally performed by officers, except as specified below.

Two (2) civilian employees may be added to the property room staff. Their duties will be limited to the receiving, cataloging or indexing, and checking out of evidence and other property received by the property room.

As noted earlier, since its creation, the position of Accreditation Manager has never been filled by a civilian employee. Deputy Darrin Marr, the Chief Steward for the FOP, testified that in his view

Section 42 speaks specifically to replacing sworn law enforcement personnel with civilians. It gives him the authority to do it in two different positions in the agency and they're both in the property room, that's what that specific section speaks to. That's the only time he can do it unless he meets and confers or goes through the negotiation process and changes the language in the contract.

The FOP's position has historically been that if the Sheriff places a civilian in a position traditionally held by a sworn law enforcement officer, that is taking away job opportunities for FOP members. The FOP had previously grieved an attempt by Sheriff Barta to transform a law enforcement position into a civilian position:

Q. So walk me through what happened, how it came to your attention of how the union decided that they may be filing a grievance, how did all that happen?

A. We were just coming off the heals [sic] of a grievance that we had filed regarding another civilian position that they were -- it had been a law enforcement position and they were wanting to make it a civilian position so we filed a grievance similar to the Olson case. We just settled that in early 2010, I believe, then this was brought to our attention. Same exact situation where they were wanting to make a sworn position a civilian position. I approached Michael George, who is the legal counsel for the Sheriff, and explained to him that we had just came off of this case where we had settled it and that the facts were pretty much the same and that the potential for us to grieve it was there.

The earlier grievance involved the Sheriff's attempt to make a Civilian Fire Range

15

Manager. The FOP took the position that the civilian fire range manager would perform duties that had traditionally been performed by a sworn law enforcement officer, in violation of MOU Section 42.18. The range master grievance was settled on March 2, 2010, with the result that no civilian would perform the range, training, and armory duties.

In February 2010, Marr learned that Barta intended to take formal action to place Olson in the Accreditation Manager position. He informed Michael George, legal counsel for the Sheriff's Office, that the FOP intended to grieve Sheriff Barta placing Plaintiff in the Accreditation Manager position. Marr and Sergeant Brad Metz also contacted Michael George to say that the FOP was going to object.

Under the MOU, the union has 15 business days from the "disciplinary action or event triggering the grievance" to file a grievance. On February 22, 2010, Marr sent George an e-mail asking for an extension of time to file its grievance to March 12, 2010. Marr requested, on March 3, 2010, another extension, thereby giving the parties time to negotiate.

In March 2010, the FOP Labor Council voted to grieve Sheriff Barta placing Olson, a civilian, in a position that had traditionally been held by a sworn law enforcement officer.[2] Gender was not an issue; the Labor Council's decision was based on the belief that the Sheriff placing a civilian in a position traditionally held by a sworn law enforcement officer was a violation of the MOU.

Det. Erin Thompson, a female member of the FOP Labor Council, would have objected if Olson's gender played a role in the union's concerns. If gender had ever been discussed as a reason for grieving Olson's placement, Thompson would have brought such discussion to the attention of the proper authorities within both the FOP and the Sheriff's Office.

The vote by the labor council to grieve the proposed change was unanimous, and

---

[2] At the time, the FOP's governing Labor Council were Sergeant Brad Jones, Sergeant Daniel Lotridge, Deputy Andrew Mergen, Deputy Jason Mills, Sergeant Kiley Rice, and Detective Erin Thompson.

Deputy Marr did not vote. On March 19, 2010, Marr spoke by phone with George about the decision. Marr told George that the Labor Council had met and wanted Luttjohann to be in the position of Accreditation Manager. Marr later memorialized the conversation in an e-mail to George, and stating that all future considerations for civilian positions proceed through the MOU's meet and confer process.

Michael George described a March 25, 2010 meeting in which Sheriff Barta made the ultimate decision to keep Luttjohann as the Accreditation Manager:

Q. Okay. And what did happen in that meeting of March 25th with the Sheriff?

A. My recollection was that we discussed the Union's position in terms of filing a grievance against the Sheriff's Office if the Sheriff went forward with his intention to make Ms. Olson the accreditation manager. And I can't recall everything, but we discussed pros and cons and discussed issues about the MOU contract and what it said. And I think at the -- and I'm sure the Sheriff would have talked about efficiency and some other things too about how he was wanting to try to change the agency. But at the conclusion of that meeting I wrote what I did, which was keep Luttjohann as the accreditation manager for now and then try and still negotiate, advise Erin Monday.

Sheriff Barta decided not to create the position of Civilian Accreditation Manager at that time, but the Sheriff's Office would continue to negotiate with the FOP with the intent to create a Civilian Accreditation Manager position in the future.

Michael George informed Olson on April 6, 2010, that Luttjohann would remain the Accreditation Manager for the time being.

Olson told George she believed this action was being taken because she was a woman. George told her it was because of the FOP grievance, and had nothing to do with her gender.

Olson contends that the FOP could not grieve the Civilian Accreditation Manager position, in light of the MOU's time limit on grievances. But that provision simply provides that a grievance must be presented within "fifteen (15) business days of the disciplinary action or event triggering the grievance." Olson has otherwise admitted that Barta had not

taken any "proper action" on the new position until February 15, 2010. Further, the FOP had promptly and explicitly sought, and obtained, an extension of time for the presentation of a potential grievance. The Labor Council's ultimate vote in favor of submitting a grievance was timely under the MOU.

During the next course of negotiations with the FOP, over 2010 and 2011, the County attempted to change Section 42.18 to give the Sheriff more power to appoint civilians to positions.

### Olson's First Grievance

On April 6, 2010, Olson filed a grievance pursuant to Shawnee County Personnel Rule 11.1. Under the county's grievance procedure, an employee presents a Grievance Form detailing the allegations of the grievance. The employee's supervisor must then investigate the complaint and respond within 10 days. If the grievance is denied or not otherwise resolved, the employee may then appeal the grievance within 5 working days of the appointing authority's response.

Once an employee files an appeal pursuant to the Grievance Procedure, the HR Director selects a grievance committee consisting of three Shawnee County employees not employed by the aggrieved employee's department, and the Grievance Committee conducts a hearing and renders a decision on the employee's grievance.

In her Grievance Form, Olson wrote:

> I have been the acting Accred. Mgr for 1 yr now. My last perf. eval was from 1/1/09-1/1/2010 which states the above. The sheriff did not take proper action at the time, and so the official I received is dated 2/15/2010. I was demoted w/out cause on 4/6/2010. My last perf eval was outstanding, and I have never been disciplined or talked to about my performance.

Olson was asked about the Grievance Form in her deposition.

> Q.   …. So you agree that the Sheriff must take proper action for you to be officially placed in the Accreditation Manager position, correct?
>
> A.   That was my statement as we read it here.

18

In the section entitled "Contract Provision/Rule or Regulation Violated," Olson indicated: "9.0 Disciplinary Action, specifically 9.6 Demotion." The Grievance Form contains no allegation that the alleged demotion was based on gender.

On April 6, 2010, the same day she filed her grievance, Olson engaged in an e-mail discourse with Diana Brey, the Accreditation Manager of the Topeka Police Department. Olson wrote:

> I filed a formal grievance through the County and I have a meeting on Thursday with an attorney. This can drag on as long as they want it, but as everyone already knows they settle all lawsuits. The way I look at it, I win regardless! : )

In another e-mail sent at 15:03, Olson wrote: "I will just work during all the litigation, they can't fire me without cause during all of this or it's retaliation."

Sheriff Barta denied Plaintiff's grievance on April 14, 2010 and stated the basis for his denial as follows:

> I have denied the grievance filed by Ms. Olson because it is without merit. Ms. Olson's grievance is premature. I have not demoted Ms. Olson or reduced her pay in any form. It was my intent to eventually move Ms. Olson to the position of Accreditation Manager. ...
>
> I made this change without meeting, conferring or consulting with the F.O.P. ...
>
> The F.O.P. orally agreed that it would not file a formal grievance on this issue if the parties took some time to negotiate the change. We agreed to the F.O.P.'s proposal and tried to negotiate the change. However, we could not come to an agreement and on March 23, 2010 the F.O.P. indicated that they wanted Mr. Luttjohann put back into his formal position as Accreditation Manager. ... I met with Sergeant Luttjohann and appropriate senior staff on March 25, 2010 and advised staff that we would move the Sergeant Luttjohann back into his former position. ... I directed Michael George and Undersheriff Holladay to continue their efforts to negotiate this change with the F.O.P. It was my hope that we could still resolve this issue with the union. Ms. Olson was advised of this change on April 6, 2010 in a meeting with Michael George.
>
> In closing, although it was my intent to make Ms. Olson the Accreditation Manager, I cannot violate the contract with the union by unilaterally making this change. This grievance should be denied. Ms. Olson has not been demoted.

Olson appealed Sheriff Barta's denial of her grievance. On April 29, 2010, Jonathan

Thummel, Deputy Director of the Shawnee County Department of Human Resources, sent a Memorandum appointing a three-member Grievance Committee to hear Olson's appeal.

The three Shawnee County employees who were ultimately selected for and served on the Committee were Mark Hixon, Kathy Ortega, and Janet Morrissey. All three were employees of Shawnee County but were not affiliated with the Sheriff's Office.

The Grievance Committee conducted a hearing on the grievance appeal June 2, 2010. Sheriff Barta told the committee that Olson was never officially made Accreditation Manager because such an appointment requires the filing of a Status Change Form with HR. Only he is authorized make such changes, and he had not done so for the Accreditation Manager position.

The committee denied Plaintiff's grievance based on the following findings:

> The record reflects that there were plans and discussions regarding the promotion of Ms. Olson to the position of Accreditation Manager. That fact is not disputed by either party. However, the record also reflects a conspicuous absence of compelling evidence that such a promotion actually occurred. Specifically, this committee believes that the Sheriff's Office is aware of and follows established procedures and files all necessary documentation and forms required to complete the process of promoting or changing the status of employees. This fact is evidenced by the copies of various signed position descriptions and status change forms wherein Ms. Olson was previously promoted and had her pay status changed on several occasions. Therefore, it is reasonable to expect that the Sheriff's Office would have filed the necessary documentation for the proposed promotion if it had been their intention to do so. Therefore, the argument that Ms. Olson was demoted is without merit. She could not have been demoted from a position to which she was never promoted.

> While there are references to Ms. Olson as the Accreditation Manager, such references do not outweigh the fact that the requisite documentation was not filed with the Human Resources Department. The chief reason cited for not completing the promotion of Ms. Olson to Accreditation Manager was due to the assurance by the Labor Council through the Fraternal order of Police (FOP) representative, Darrin Marr, that the FOP would not agree to the promotion of a civilian (Ms. Olson) to the position of Accreditation Manager. The record further reflects that the FOP's involvement in this matter was preemptive, with the intention of preventing the action (promotion of a civilian) that would have resulted in the filing of a grievance by the FOP. But, since the promotion did not occur, there was no need for the FOP to file a grievance and none was filed.

On April 7, 2010, Plaintiff filed a Complaint Report against Marr, alleging that he

had engaged in "Workplace Harassment based on gender and employment class." Her report alleged that Marr

> has created a hostile work environment, and he is unreasonably interfering with the work that I have done for over a year now. This has also affected my employment opportunity. I strongly believe that he has abused his FOP position to personally go after my job because I am a civilian, female employee. I believe that if this transition would have involved a male civilian, it would not have been a problem. The same set of circumstances happen [sic] two years ago when Jack Morgan left. The training function (which was a Sgt. position) was given to a male Lt., and the Accreditation position was given to a male Sgt. The FOP did not question nor threaten to grieve this change and allowed this change to happen. Within the last year, the Training function was given back to a Sgt., and the Accreditation position was given to a civilian, female employee. The FOP has since threatened to file a grievance on multiple occasions, which has caused my work performance to be unreasonably interfered with for the past year.

Olson has admitted that Jack Morgan was a certified law enforcement officer.

Olson also alleges that, when she learned the FOP intended to file a grievance about making a civilian Accreditation Manager, she emailed Marr to see if this was true. According to Olson, Marr responded that "we simply don't want a female in that position." She has alleged that Marr made this comment verbally and through e-mail. She alleges that Luttjohann heard Marr's verbal comment.

Olson testified in her deposition that she no longer has the alleged e-mail. In addition, while she was employed, Olson maintained a document entitled "Dates and Events" which she used to provide a detailed description of events that happened. When describing the alleged statement from Marr in her Dates and Events document, Olson made no reference to any e-mail.

Marr denies ever making such a statement. Luttjohann cannot remember Marr ever speaking about Olson's gender.

Michael George does not recall ever being shown or told about this e-mail. Olson never showed Luttjohann or anyone this alleged e-mail from Marr. Luttjohann testified he does not recall Olson ever reporting any statements by Marr relating to her gender.

According to Olson, she believed Marr was speaking individually when he allegedly

made these statements. She did not think he was speaking on behalf of the Sheriff or the FOP.

HR Director Richard Davis investigated the complaint. and interviewed Olson. Olson told Davis that Marr had told her, "FOP doesn't want a female in the position because a female can't do the job."

Davis spoke with Marr. Marr said that Olson had approached him, and asked him to write a letter from the FOP regarding its position on the Accreditation Manager Position. He denied making any statements about Olson's gender. He told Davis this was an FOP issue, not a female issue.

Marr also told Davis that Sergeant Alan Simon was present during Marr's conversation with Olson, so Davis spoke with Simon by telephone. Simon stated he was present when Olson approached Marr, and that he never heard Marr make any statement that he did not want a female in the Accreditation Manager position.

Davis interviewed Lt. Ostenson regarding the complaint. Ostenson stated Olson had never told him about any such statement by Marr.

Davis met with Deputy Rice, who worked near Olson. Rice said he never heard Marr make any negative comments regarding Olson or females. He also stated that gender was not at issue from the FOP's perspective.

Davis next interviewed Sergeant Brad Metz. Metz stated that he never heard any comments concerning Olson's gender and the Accreditation Manager position.

Davis interviewed Detective Erin Thompson, who told him that she had never heard any such comment from Marr. Thompson also told Davis that the FOP's objection had nothing to do with gender.

Davis interviewed Sergeant Steve Evans by telephone. Evans denied ever hearing any such comment from Marr. He also told Davis that he had worked with Olson several times, and she had never expressed any complaints about such a comment.

On April 30, 2010, Davis interviewed Sgt. Luttjohann. Luttjohann said he was unaware of any comment by Marr relating to Olson's gender, and he did not recall ever receiving a complaint about such a comment from Olson. Luttjohann said that he had had several conversations with Marr about Olson being placed in the Accreditation manager position.

Davis interviewed Capt. Hoobler, who said he had never heard of any comments by Marr relating to Olson's gender. Hoobler admitted he had conversations around late February or early March regarding the FOP's resistance to the change, but gender was never mentioned.

Olson did not provide Davis with any document, correspondence, e-mail or memorandum authored by Marr which contained a comment to the effect that the FOP did not want a female in the position.

On May 18, 2010, Davis sent Olson a letter informing her that he had conducted an investigation, interviewed multiple witnesses, and was unable to substantiate that Marr had made statements regarding Olson's gender and the Accreditation Manager position.

The same day, Davis wrote to Marr, stating that he had been unable to substantiate Olson's claims. He also advised Marr that Shawnee County policies expressly prohibited both harassment and discrimination. Davis also instructed Marr not to "do anything that might be viewed as retaliating against" Olson.

### Alleged Desk Vandalism

On May 19, 2010, the day after she received Davis's report, Olson told Lt. Ostenson that someone had pulled proofs from the CALEA cabinet, tore them up along with some accreditation pamphlets, and placed them around her workstation.

She reported the incident to Ostenson. According to both Ostenson and Luttjohann, when she was questioned about the damage, Olson suggested that the damage might have

been done by an employee's child wandering around after hours. Olson denies ever making this statement.

Lt. Ostenson testified:

Q. In that first paragraph there's a reference there that: While in the ATU unit, Erin tells me someone has pulled proofs from her CALEA cabinet, torn them in half, and placed them in areas around her work station, (desk area, trash can, shred drawer). The community service pamphlets -- and that's what she told you; correct?

A. Yes.

Q. Did she show you any of this?

A. No.

Q. Did she, did she point out to you while you were in the ATU unit any torn pamphlets?

A. No.

Q. Did she point out to you any, any pamphlets or community service information being thrown in her office or shredded in her drawer or anything of that nature?

A. No.

Q. This is what she verbally told you; correct?

A. Yes.

Q. In regards to providing any physical evidence in regards to torn documents she didn't show you any of that did she?

A. No.

Q. And this was the point in time where you later learned from Lieutenant Mergen that she then claimed on one of these pamphlets someone had written some derogatory comments; correct?

A. Yes.

As some point after the initial report about the torn-up pamphlets, Olson added an additional charge: that at the same time as the torn-up pamphlet incident, someone had written "Fucking Cunt" on one of the pamphlets or brochures left on her desk. It is undisputed that this note is not referenced in Olson's initial complaint to Ostenson. There is a factual dispute whether Olson showed the insulting note to Luttjohann. Olson claims she did, Luttjohann denies it. Luttjohann testified that he has never seen the note with the derogatory comment which Olson said had been left on her desk. He has no recollection

that Olson ever told him about the note. Olson admits that she never showed the note to Ostenson.

The fate of the alleged note is also a mystery. On May 26, 2010, approximately a week later, Lieutenant Richard Mergen approached Lt. Ostenson and informed Lt. Ostenson that he had heard a rumor that someone had written a derogatory term on a piece of paper left on Olson's desk. Lt. Ostenson was "shocked" that he had not heard about this comment, and that Olson had not told him about the derogatory comment when she reported the allegedly torn pamphlets. The next day, Ostenson approached Olson. She asserted she had not mentioned the note because she had sent the note, marked confidential, to Rich Davis. Davis has stated that he never received any such communication.

Olson was asked in her deposition about why she did not mention the note at the same time she reported the desk vandalism.

Q. Ostenson has notes that indicate that you talked to him the day that your desk was trashed and the pamphlets were torn and that on that occasion you said nothing to him about any note.

A. I don't believe I had mentioned the fucking cunt comment that was made. I wanted that to remain a detail that only Rich Davis had.

Davis has stated that Olson did not tell him of the insulting note. He first learned of Olson's claim of vandalism to her desk when he attended her June 2, 2010 hearing before the Grievance Committee.

After the hearing, Davis met with Olson and asked her why she had not informed him of this incident. Olson told him that she had placed the evidence in an envelope marked "Confidential" and placed it in normal mail distribution. Olson told Davis that she had shown some of the torn pamphlets to her supervisors, and that she might still have some physical evidence. As Davis later wrote in an email, "I asked her why she didn't inform me sooner [about the insulting note], and she didn't have a good answer."

On June 7, 2010, Sheriff Barta received a letter from Olson with her allegations. She

acknowledged that she knew Barta was not aware of the allegations at that time:

> Secondly, and of even greater concern were actions taken against me on May 20th where a CD which I received from TPD was intentionally destroyed on my desk. I also found several brochure templates that I had been working on, torn up. One brochure in particular had the words written on it, "fucking cunt." From your response, it appears you are not aware of these situations.

Sheriff Barta testified that his initial reaction upon receiving this correspondence from was to make sure that the evidence was secured.

Davis was unable to confirm that Olson had ever shown any of the torn brochures to her chain of command. Olson claimed that she had shown them to Luttjohann, but Luttjohann indicated that she had not done so.

On June 17, 2010, Davis sent Plaintiff a letter relating to this incident. He reiterated the need for physical evidence. He related their earlier conversation in which she had "told me that you still had some of the evidence, and I asked you to send it to me so I could have it checked for fingerprints." Davis asked her to send him the remaining physical evidence she had from the incident. He also stated that if she did not provide him with any physical evidence by June 25, 2010, he would close the claim as unverifiable.

It is uncontroverted that Olson has never provided Davis with any physical evidence or other documentation relating to this incident.

Olson did not take a photograph of the notation with the derogatory comment or of the torn pamphlets on her desk despite having that capability.

Davis closed the investigation due to a lack of evidence.

### *Taunting by Metz*

Plaintiff described an incident with Sgt. Metz as follows:

Q. Now, I've seen a note but I don't have an actual complaint, but there's a reference that on June 11, 2010, you complained about Brad Metz making a statement to Steve Luttjohann, something to the effect how is accreditation going?

A. Yes, I recall that.

Q. Tell me about that.

A. Shortly after my grievance hearing, Brad Metz had come and walked by my cubicle area taunting me with that comment of how's accreditation going today, buddy, and he looked at me and smiled at me as he said it, and it was in a very sarcastic tone.

Q. Now, Steve and you shared a cubicle?

A. Yes, Steve Luttjohann and myself shared a cubicle.

....

A. He looked at Steve and said, "How's accreditation going today, buddy?" And looked back at me and sarcastically smiled.

Olson contends that Metz's actions were "retaliation." She believed that Metz was "retaliating against the grievance" she had filed with the county regarding the promotion. She reported the comment to Capt. Hoobler and Michael George.

Metz acknowledges he made such a comment to Luttjohann, but has testified that he was not directing the comment toward Olson, and that he was unaware she was even in the area at the time.

*Complaint Regarding June 29, 2010, Meeting*

On June 17, 2010, Plaintiff sent an e-mail to Lt. Ostenson stating:

I would just like to comment that this is the 4th day in a row (this week) that my sgt. has taken a 2 hour lunch. I feel the same standards need to apply to all employees, and not just the chosen few. I know we have discussed this before. Since nothing has changed since our conversation on this, I am left to believe that he has not been talked to or has simply chosen not to listen. I would at least like to see an improvement in this issue (maybe only an hour and a half next week). I feel that by not holding him to the same standards as the rest of people in this division, it creates a system of unfair practices and possible employee classification discrimination.

Olson testified that she wrote this email because she had difficulty getting reaching Luttjohann when he was away from the office. She acknowledged that the e-mail made no reference to having difficulty getting in touch with Luttjohann. She also acknowledged that Luttjohann carried a cellphone, and she could have reached him by calling his cell phone.

Ostenson responded to her the next day, stating that he and Capt. Hoobler would

like to meet with her. Olson asked that the Sheriff, Undersheriff, or an HR representative sit in. At that point, a meeting was not scheduled.

On June 28, Olson emailed Ostenson, Capt. Hoobler, Undersheriff Holladay, and Sheriff Barta asking about the meeting, and indicating that she wanted a third party present.

Olson met with Capt. Hoobler, Lt. Ostenson, and Jonathan Thummel of HR on June 29. Olson was told that other agency member's schedules and work performance were not her concern. Thummel told Olson that he had never been pulled into a meeting like this, and that Olson should comply with supervisor requests as to meeting schedules.

Hoobler told Olson that in the future she was not to avoid a meeting or demand the attendance of certain persons. If she directly refused to attend a meeting, that could be considered insubordination. Capt. Hoobler also declined to discuss Sgt. Luttjohann's schedule with her. Hoobler told Olson that she should not email responses to questions or otherwise review general CALEA policy without approval by Ostenson or Hoobler.

In the future, Olson was to report directly to Ostenson. She was also reminded to arrive at work on time.

According to Olson, the meeting was intimidating because Hoobler had used a "loud and gruff tone of voice" and because he told her Luttjohann's schedule was "none of [her] damn business." Olson did not report her belief that the meeting had been threatening and intimidating to anyone. Nor did she ever file a complaint over the meeting.

After the conclusion of the meeting, Olson asked Ostenson to document the meeting for her. In an e-mail, she also indicated to Ostenson that she had recorded the meeting with her tape recorder, but she had already given the tapes to her attorney. Olson now concedes that she has no recording of the meeting.

In contrast to her statement to Ostenson that she had a recording but had send it to

28

her attorney, Olson subsequently stated that she had no recording showing Hoobler's gruff tone at the June 29 meeting because the recorder did not work. It is uncontroverted that Olson presently has no such recording.

### Alleged Theft of Recorder

Olson emailed Ostenson on July 8, 2010 stating that her tape recorder was missing from her desk. She also reported that she had found another Accreditation file with missing CALEA "proofs." She wrote that she believed she had found approximately 25 to 30 proofs missing over time.

Lt. Ostenson testified to his response to these e-mails:

Q. And what, if anything, did you do about that when she reported that to you?

A. Well, my response was to go -- well, first of all it was addressing two issues; the first one was the missing proofs and to just document those. And that looks like where I'm giving her clear instructions, just keep a running date and log them and so forth. And then I mention the theft of the recorder, I see that as theft.

Q. Uh-huh.

A. If it's missing, you know, it could be misplaced but I didn't take it as being misplaced, I saw it as this is probably a theft and needs to be investigated so I asked her to report that to HR.

Ostenson asked Olson to document the dates and files which had been affected by missing proofs. Ostenson cannot recall ever receiving any such documentation.

Olson filed an offense report relating to the missing tape recorder, and Detective William Vaughn was assigned to investigate. Vaughn considered the investigation to be a criminal investigation. He first interviewed Olson, asking her who she suspected. Olson identified Capt. Hoobler, Sgt. Metz, and Deputy Marr. In her deposition, Olson testified that this suspicion was not grounded on "any evidence either by way of documentation, physical evidence or witnesses."

Hoobler told Vaughn he knew of the reported theft, but he did not have any further

information. Deputy Marr and Det. Metz denied any knowledge of or involvement in the theft of the recorder. Vaughn later testified that, without surveillance, it would be difficult to prevent a theft from that area because people were free to walk in and out of the area.

Vaughn again met with Olson on July 28, and told her there was not enough evidence to substantiate who was responsible for the theft of the recorder. Therefore, the case would be placed on inactive status.

As with the tape recorder, Olson does not have any direct evidence to support her belief that Metz or Marr was responsible for the missing proofs:

> Q. What's the good number of incidents that you are talking about in regards to the retaliation of Brad Metz and Darrin Marr?
>
> Q. How do you prove that they did it?
>
> A. I believe they are responsible for it.
>
> Q. How do you prove that they did it?
>
> A. I don't have direct prove [sic].
>
> Q. You don't have any evidence, correct?
>
> A. We are still in discovery right now. I don't have anything right now.
>
> Q. You don't have any evidence, correct?
>
> A. Right now, I do not have any evidence.

(Olson dep. 201).


*Robert Lewis Complaint*

On July 28, 2010, a citizen by the name of Robert Lewis came into the Sheriff's Office to register within the computer system as an criminal offender. While he was there, Lewis complained to Shawnee County Sheriff's Office Deputy Emily Adams that Olson had gone door-to-door in their neighborhood, identifying herself as an employee of the Shawnee County Sheriff's Office and accusing a Robert Lewis of committing a burglary and theft at her residence.

Olson had spoken to her neighbors after a shed on her property had been broken

into ten days before. She also went to Lewis's door, and told him about the burglary. Lewis identified himself as Robert Lewis and told her he was not involved.

Lewis told Deputy Adams that he was not happy about this conduct, particularly because Olson was accusing him of burglary and theft to his other neighbors. Adams reported the complaint to her chain of command.

Captain Philip Blume ultimately received the information and filed a Complaint Report, which detailed the following:

> Employee Erin Olson was a victim of a burglary to her shed at her residence. Topeka Police took the report. Erin Olson conducted a neighborhood canvas on her own and was apparently telling neighbors that Robert Lewis was responsible for the burglary and theft. Erin Olson unbeknownst to her spoke with Robert Lewis informing him of this information and he advised her that he was Robert Lewis and that he was not involved. Robert Lewis indicated that Erin Olson identified herself as an employee of the Shawnee County Sheriff's Office when this contact took place. Robert Lewis is a restricted registered offender meaning that his information is not for public record. It is unknown if Erin Olson discussed this information to other neighbors. Robert Lewis was in the Sheriff's Office on Wednesday July 28, 2010 and met with Deputy Emily Adams and provided all of this information. Robert Lewis conveyed to Deputy Adams that he was not happy about this contact and or that Erin Olson is accusing him of burglary and theft to the other neighbors.

Sheriff's Office General Order #87-005 is entitled "Citizens' Complaint Procedure and Professional Standards Unit," and it provides the procedures for investigating complaints against the Sheriff's Office as well as the establishment of the Professional Standards Unit ("PSU"). The purpose of the PSU is to perform investigation of internal matters as directed by the Sheriff, and Members of the PSU receive assignments from and are directly accountable to the Sheriff.

According to Sheriff's General Counsel Michael George, "Complaints of a serious nature, which, if substantiated, have a high probability of resulting in disciplinary action" are brought to the Sheriff or Undersheriff for review. If an investigation is warranted, the Sheriff will refer such complaint to General Counsel for review and investigation.

Complaints which may warrant a PSU investigation include, but are not limited to,

31

complaints which implicate criminal activity, civil rights violations, and substance abuse violations. PSU investigations are classified under seven categories: conduct, use of force, competency/efficiency, arrest/charge, use of firearms, substance abuse, and other. Generally, investigations into Citizen's Complaints require a citizen to return a Citizen's Complaint Form detailing the complaint; however, the Sheriff may initiate an investigation without a completed form when circumstances warrant.

Once a PSU investigation has been initiated, the General Counsel directs a member of the PSU to conduct a thorough investigation. After its completion, an investigation is judged either sustained, not sustained, unfounded, exonerated, or closed.

As a result of the complaint against Plaintiff, Sheriff Barta requested a PSU investigation into the Complaint, which was directed by Lieutenant Scott Askew. Askew spoke with Lewis on August 5, 2010. From this interview, Askew reported:

1. Olson had been going door-to-door in the neighborhood talking about her house getting broken into.
2. Olson said she had been told by the Topeka Police Department Officer that a Robert Lewis had just got out of prison, and he could be the one doing it.
3. Lewis told Olson that he was Robert Lewis, and he had not just gotten out of prison and did not break into her house.
4. Olson told Lewis that she worked for the Sheriff's Office, and she knew he was a registered offender because she had looked into the database.

The next day, Askew interviewed a neighbor who lived two streets over from Olson. Belinda Gagelman told Askew that Olson had gone door-to-door talking to Galgelman and Gagelman's neighbors. Olson told Gagelman that she worked for the Shawnee County Sheriff's Office, and that her shed or garage had been broken into. Olson told Gagelman the thief was a black gentleman with dreadlocks who lived at a specific address a few duplexes down, who had just been paroled from prison. Olson told Gagelman that undercover narcotics officers from the Sheriff's Office would be watching Lewis. These officers would be two white males who looked scruffy, around 35 or 40 years old, and they would be driving a white or red SUV.

Askew interviewed another neighbor, Thomas Wright. Wright said that Olson had knocked on his door, and told him she worked for the Sheriff's Office. She told Mr. Wright her shed had been broken into, and she suspected the black male who lived nearby, and that her suspect had just gotten out of prison. Olson told Wright she was going to call the suspect's parole officer.

Askew interviewed Lt. Gary Hermann, the Topeka Police Department whom Olson had spoken to after the burglary. Hermann told Askew that he had identified Lewis to Olson as an offender living in the neighborhood. He told Olson that he was watching Lewis, and that "she might want to get her neighbors on the same page about him."

On August 17, 2010, Askew interviewed Olson. In the interview, which was recorded on video, Olson stated that she had been a victim of a robbery at her home on July 18, 2010, and she filed a police report with the Topeka Police Department. Olson stated that she had spoken with her neighbors, but denied telling anyone where she worked. She did tell her neighbors that the Topeka police officer had told her that Robert Lewis was a known burglar. She denied telling anyone that the narcotics unit would be attempting to purchase drugs from Lewis, nor did she describe the narcotics unit officers to Gagelman.

Askew reported the following Findings of Fact as a result of his investigation into the Complaint:

7/18/10-     OAII Erin Olson reported to the TPD she was the victim of a burglary to her shed 7/18/10- After identifying herself as working for the Sheriff's Office, the responding officer told Ms. Olson a known burglar by the name of Robert Lewis had moved into the area.

7/18/10-     Ms. Olson goes door to door in the 1100 Block of SW Hillsdale advising neighbors she worked for the Sheriff's Office and she suspected Robert Lewis of that burglary.

8/6/10-     Thomas Wright confirms Ms. Olson introduced herself, told him she got her shed broken into, she worked for the Sheriff's Office and that she thought it was Robert Lewis who was responsible.

8/6/10-     Belinda Gagelman confirms Ms. Olson introduced herself, told her her shed was broken into, she worked for the Sheriff's

Office and that she thought it was Robert Lewis who was responsible.

8/17/10-     Interviewed OAII Olson. She denies telling neighbors she worked for the Sheriff's Office. She admitted to telling the neighbors Robert Lewis was a known burglar.


Under "Conclusions," Askew determined:

OAII Olson had contact with Robert Lewis and people in the Mr. Lewis' neighborhood on 7/18/10. Ms. Olson, per three independent people, identified herself as working for the Sheriff's Office when making contact with Mr. Lewis and his neighbors. Ms. Olson was untruthful when answering "no" regarding my questions of whether she had told Mr. Lewis, Mr. Wright or Ms. Gagelman she worked for the Sheriff's Office. These interviews were conducted independent of each other and each person said Ms. Olson identified herself as working for the Sheriff's Office.

Shawnee County Sheriff's Office General Order 87-006 II. B. 1 provides:

It shall be prohibited for any member of this agency to communicate confidential information to another member of this agency or to a person outside this agency, unless he or she is authorized to do so, either explicitly by a superior officer or implicitly when necessary to the performance of an official duty.

Shawnee County Sheriff's Office General order 87-007 II. 2. A., 3. c provides:

Agency members shall be accurate, complete, and truthful in all matters, other than where necessary to perform essential, official duties (such as tactical deception in interrogation or during investigations where the safety of the officer or integrity of the investigation requires it). No agency member shall make false reports or knowingly enter or cause to enter in any agency book, record or reports, any inaccurate, false or improper information or material matter.


Shawnee County Personnel Rules Section 9.5 is a non-exclusive list of offenses which

are considered "Grounds for Suspension or Dismissal" and provides, in relevant part:

O. Knowingly releasing confidential information from official records; P. Exhibiting other personal conduct detrimental to Shawnee County service that could cause undue disruption of work or endanger the safety of persons or property of employees or others, as may be determined by the appointing authority;

....

R. Unreasonable or abusive treatment of a client, citizen, Shawnee County employee or other individual in the community;

....

U. Dishonesty in any form or degree.

When Sheriff Barta receives a completed PSU investigation, he reviews all of the investigative reports before he issues any discipline as a result thereof. He did so after Barta's report, and decided a Written Reprimand was necessary. Olson had released confidential information regarding Sheriff's Office undercover narcotics information and had given the impression to her neighbors that she had been conducting an investigation on behalf of the Sheriff's Office. The Sheriff issued the reprimand on August 26, 2010. The Sheriff wrote:

> After having reviewed the above Professional Standard Investigation and relevant documents, I have made the following determinations. On July 18, 2010 while off duty you interviewed several people in the Topeka community about a burglary that took place at your personal residence. During these interviews you identified yourself as a Shawnee County Sheriff's Office employee. You then identified Robert Lewis as the one you believed that had burglarized your residence and communicated this information to several citizens. You further provided to one citizen that the Shawnee County Sheriff's Office narcotics unit would be buying methamphetamine from the house of Robert Lewis at 1172 Hillsdale. You subsequently provided a physical description of the narcotics officers and the type of vehicle the officers would be driving. Finally, you were not truthful in your answers to the questions raised by Lieutenant Askew during this investigation.
>
> I have concluded that your conduct is a serious infraction in violation of two General Orders. Please review General Orders 87-006 II. B. 1. And 87-007 II. 2. A, 3.c. In addition your conduct violated Shawnee County Personnel Rules 9.5 sections O, P, R, and U.
>
> Therefore, pursuant to Shawnee County Personnel Rule 9.3, I am issuing you a written reprimand as discipline in this case. Erin, as an employee of the Shawnee County Sheriff's Office it is inappropriate for you to conduct a personal investigation of a private matter and identify yourself as an employee of this office. This gives the wrong impression that your investigation is an official action of this office. Erin, you are not a sworn officer trained to conduct this type of investigation. You placed yourself into a potentially dangerous situation. Furthermore, your releasing of confidential information about our narcotics unit employees causes potential danger to the security and well being of those officers. Your lack of truthfulness about this event is unacceptable.

Olson did not prepare any report to rebut or contest the written reprimand.

*Alleged Note on Olson's Door*

During the course of her August 17 interview by Lt. Askew which led to her reprimand, Olson stated that a note with the words "quit or die bitch" had been left on the residence of her door some six weeks earlier. This was apparently the first time that Olson had made any official report about the incident. Askew told Olson that, if this was true, it would be a crime and she should report it.

Following the interview, Olson reported the note to Lieutenant Richard Mergen of the Sheriff's Office. Olson claimed that, on July 1, 2010, she came home during lunch and found the note taped to her back door. She did not report the note to any law enforcement agency when she found it. She did tell Mergen that she had placed the note in a freezer bag in order to preserve it.

However, Olson does not have the note. She acknowledged in her deposition that despite telling Mergen she had placed the note in a plastic bag in order to preserve it, she never presented the note to any Law Enforcement Agency, and instead, she threw the note in the trash on or about July 14, 2010.

Olson told Mergen she believed Sgt. Metz and Deputy Marr were responsible for placing the note. She admits she has no evidence to support her suspicion.

The Sheriff's Office has a memorandum of agreement with other area law enforcement agencies, providing that other agencies will conduct investigations when there are allegations that a Shawnee County Sheriff's Officer may have committed a crime. Sheriff Barta forwarded the report about the alleged note to the Topeka Police Department.

Captain Kirk Thompson, head of the Topeka Police Department Professional Standards Unit from May 2008 through July 2011, undertook the investigation. He testified that his responsibility was "to focus on whether or not a criminal offense had occurred and who was responsible for that offense." Thompson focused on Metz and Marr because of Olson's reported suspicion.

Thompson conducted approximately seventeen interviews, including several employees of the Sheriff's office.

Terri Neill, a coworker and friend of Olson, stated that Olson had told her about a note at Olson's house, but she had never seen the note and did not even know where in Olson's house it had been placed. Neill also stated her understanding that Olson had related other incidents of harassment, but that Neill had never witnessed any incident herself. Neill also told Thompson that she had heard some deputies say they did not want a woman in the Accreditation Manager position.

Thompson spoke with Deputy Marr, who denied having anything to do with the note, or ever having been to Olson's residence. He also provided Thompson with information about what he believed his whereabouts were on the date in question, and other information regarding the complaints Olson had asserted against him.

In his interview, Sgt. Metz also denied any involvement. He stated he did not know where Olson lived and had never been to her residence. During the time in question, he was on vacation, and out of town.

Thompson intended his investigation to be objective and independent of the Sheriff's Office. Capt. Thompson had minimal contact with the Sheriff's Office other than for the purpose of requesting information and conducting interviews. There was never a time during his investigation that Thompson believed the Sheriff's Office was not cooperating with him. There was never a time during his investigation that the Sheriff's Office did not provide information upon his request, and he never felt that the Sheriff's Office was attempting to obstruct or direct his investigation. If he had felt the Sheriff's Office was trying to do so, he would have recorded that information.

As a result of his investigation, Thompson concluded that he had been unable to develop evidence that Deputy Marr, Sgt. Metz, or any other individual had been involved with placing the threatening note on her door. Thompson had questions regarding the lack

of physical evidence relating to the note on the back of the door, including the destruction of the note, the lack of fingerprints on the door, and the fact that Plaintiff and her husband had provided inconsistent descriptions of the note.

Thompson told Olson that he did not find anything during his investigation to support her allegation that someone had taped the note to her back door. He told her that he might have had enough information to charge her with filing a false police report.

On November 16, 2010, Thompson sent a copy of his investigative file to Shawnee County District Attorney Chad Taylor. In his cover letter, Thompson stated that he had been unable to determine the identity of who was responsible for delivering the threatening note. It further indicated that he had not uncovered any credible evidence that the threatening note was the responsibility of any Shawnee County Sheriff's Office employee.

On December 21, 2010, Thompson received a letter from Taylor stating that the District Attorney's Office would decline to prosecute the case and would consider the matter closed.

### Deputy Marr and Sgt. Metz Complaints Against Plaintiff

On August 16, 2010, Deputy Marr and Sgt. Metz filed separate complaints against Olson. Marr complained that Olson was "creating a hostile work environment by repeatedly filing and making false accusations against" him. Metz also alleged that Olson had created a hostile work environment.

Marr's Complaint was not investigated. On August 26, 2010, Rich Davis issued a Memorandum to Lt. Askew, Sgt Metz, Deputy Marr, and Olson addressing the Complaints on file. Davis indicated he was placing his investigation of the Complaints at abeyance until law enforcement and KHRC investigations into the individual complaints had been completed.

*Complaint Regarding Sheriff's Office Corporal*

In her KHRC Amended Complaint, Olson reported that, on November 1, 2009, she had filed an internal complaint "[b]ecause Cpl. Kampsen repeatedly subjected me to sexually harassing behavior including sending me sexually explicit text messages, and grabbing my rear end." She also alleged "[o]n or about November 4, 2009, I again complained to my supervisor about sexually explicit rumors which I was told were circulating around the department about me, started by Cpl. Kampsen."

Olson did not include any reference to Kampsen or these allegations in her Complaint filed with this Court.

In her deposition, Olson testified that the incident where Kampsen allegedly grabbed her occurred in October 2009 while she was at a bar with her husband and some friends.

Sgt. Luttjohann testified that Olson texted him that an officer had grabbed her butt, but Olson did not tell him which officer. Luttjohann told her he would dispel the rumor.

Section 42.5 of the MOU between the FOP and Shawnee County provides that if there is a Complaint filed against an FOP member, the FOP member must be notified of such Complaint upon receipt.

When Kampsen learned from Undersheriff Holladay that Olson had filed a complaint against him, he filed a complaint against her, stating that Olson's allegations were false and that he believed her accusations constituted unprofessional behavior. Kampsen testified he made the complaint to protect his interests and to stop false accusations. In his complaint, he stated, "I am concerned that even my most professional behavior toward her will be twisted by her into a false complaint against me. She has made my working conditions intolerable with having to defend myself against totally false accusations."

Olson believes that Kampsen's complaint constituted retaliation on behalf of the

Sheriff's Office.[3]

### *March 2011 Complaint Regarding Alleged Harassment*

In July 2010, Luttjohann expressed a desire to transfer to patrol and out of the Accreditation and Training Unit. Sergeant Justin Vest expressed interest in taking over Luttjohann's position. Sheriff Barta subsequently granted the transfer, and Vest became Accreditation Manager.

On March 4, 2011, during a meeting with Vest and Olson, Ostenson presented an updated version of Olson's position. Olson declined to sign or review it, until her attorney had reviewed it.

Ostenson told Olson that this was an employment issue and was not an issue for her attorney. He also said that failure to sign the Position Description could be considered insubordination because he had given her a direct order. Olson did not sign her position description.

Instead, she took the document home with her to review, and to have her counsel review the document.

On March 8, 2011, Ostenson found the Position Description in his mail box. Olson had signed it, but also wrote "while I do not agree with the changes, I acknowledge that I have read & received a copy." Olson testified that the way she signed her position description reflected her own personal choice.

Ostenson then approached Olson to ask her what, specifically, she disagreed with

---

[3] In addition to her other complaints, Olson's also cites (Dkt. 148, at 54-55) the General Order announced October 14, 2010 generally forbidding the recording of conversations between workers. Olson met with Barta, who agreed to allow her to use her tape recorder in some situations. It is difficult to assess this complaint however, because the explanation of the incident in Plaintiff's Response Brief is incomplete, stopping in midsentence. (*Id*. at ¶ 171). Further, there is no evidence that Olson sought permission for recording and had it denied. To the contrary, Olson herself otherwise cited a recording she made of the May 11, 2011 meeting, which took place after the new General Order.

or did not understand in her new Position Description. He reminded Olson that it was his responsibility to insure that she understood her Position Description and to attempt to clear up any concerns she may have. At that time, Ostenson was in Olson's chain of command, and the one whom she was dealing with in regards to her job description.

Olson acknowledged in her deposition that she knew the way she had signed the job description "created some question." In light of that ambiguity, Ostenson could want an explanation, and that "[i]t was not inappropriate for him to ask me, no."

Nevertheless, Olson refused to answer.

Olson described the incident in her deposition:

Q.    And he came up to you after getting your job description that you'd signed and asked you why you signed it that way, true?

A.    That's correct.

Q.    And he also asked you about which parts you did not agree with, true?

A.    That's correct.

Q.    And you told him according to your statement the description as a whole?

A.    That's correct.

....

Q.    And in regard to this description, he's asking you for what changes you wouldn't agree with and your response to him I am not going to give you specifics, I just don't like it as a whole, correct?

A.    I told him the document as a whole.

Q.    And he continued to ask you what specifically did you not agree with, correct?

A.    He continued to harass me and try to force me to give him an answer, yes.

Q.    Well, my question was: He continued to ask you what changes in the job description you did not agree with, correct?

A.    He continued to ask me, yes.

Q.    And you characterized that as harassment and intimidation, correct?

A.    I did, yes.

Olson testified she believed that she was being "forced to sign documents in lieu of punishments" because she was told it could be considered insubordination if she refused

to sign it the way Ostenson wanted her to sign it. She ultimately signed the document how she wanted to and was not issued any discipline.

Olson sent an e-mail to Rich Davis and Jonathan Thummel at the Shawnee County HR stating that she needed to file a complaint against a Sheriff's Office employee. This complaint was forwarded to Lieutenant Philip Higdon.

Higdon interviewed Olson on March 11, 2011. She told him that she felt harassed and threatened by Ostenson when he raised his voice while meeting with her. She showed Higdon two notes she had written after the meeting. The first statement indicated, "being forced to sign documents in lieu of punishments." The second statement indicated, "was again denied right to my counsel."

Higdon spoke to Sgt. Vest, who stated that Ostenson never raised his voice, talked in a professional manner, was matter-of-fact, but not mean. Ostenson did not do or say anything inappropriate during the conversation, while Olson appeared confrontational.

Higdon also spoke with Sgt. McKay and Michelle Guzman about the incident, but both were off duty at the time. He also determined that Rosie Sweeten and Virginia Best were unable to substantiate Olson's claims.

Higdon interviewed Ostenson regarding the events of March 4 and March 8. Ostenson denied that his or Olson's voices were ever raised.

Higdon concluded that based on the interviews he had conducted he could not substantiate the allegations Olson was making against Ostenson. Higdon provided his report to Michael George.

*March 2011 Discipline*

On March 4, 2011, Vest told Ostenson that Olson was late to work. When Olson arrived, Ostenson told her, "Erin, you're late." Olson did not respond or acknowledge Ostenson and kept walking past him, going to her workstation.

Ostenson followed Olson to her workstation, and told her, "Erin, you've been late several times recently." Olson did not reply.

She tossed her work keys into her cubicle and told Ostenson, "Well then you can pay me for the lunch breaks I have worked through."

It is uncontroverted that Ostenson viewed Olson's behavior in regard to throwing her keys and the tone of her comment as being rude and disrespectful. He testified, "Her behavior towards me was rude. I was insulted by it and the throwing of the keys, keys and being evasive with me when I was trying to talk to her."

Ostenson told Olson what she had just done "was not cool" and that it was going to be addressed later, but he had to leave to go to a DARE interview.

On March 10, 2011, Ostenson issued to Plaintiff a letter of written reprimand regarding her conduct on March 4, 2011, regarding her unprofessional conduct and the tossing of her keys onto her desk. Ostenson wrote:

> On March 4, 2011 I observed you arrive to work after 0830. As you are aware your workday is supposed to start at 0830. I advised you of your tardiness to which I received no response. I again, in a louder voice advised you of today's tardiness and you're past week's tardiness. It was apparent I wished to engage you in a conversation in order to discuss the situation. However, you walked away from me and into your workstation area. As you got close to your desk you said something in an unprofessional tone to the effect of "you should pay me overtime for working through my lunches" and you simultaneously tossed your keys from about 4 ft. onto your desk.

Ostenson indicated Plaintiff's behavior was a violation of General Order 87-007 section II A.4.a., which requires agency members to act with "respect, courtesy, and professionalism."

Each employee at the Sheriff's Office is assigned a key fob, which is an electronic key which allows the employee to access certain areas of the Sheriff's Office. This system tracks and records each time an employee uses his or her assigned key fob to access a door within the Sheriff's Office. However, the system does not document entries which are made when the front lobby sergeant remotely triggers an entry.

Ostenson accessed the system to officially document the dates Olson was tardy for the purposes of the discipline he would issue.

It is uncontroverted that Ostenson's Notice of Intent to Discipline referenced Olson's habitual tardiness for the dates from February 22, 2011, through March 4, 2011.

This Notice was the first step in Ostenson's effort to discipline Olson for tardiness. The Notice does not effectuate discipline, but is used to give an employee notice that there an intent to discipline.

Ostenson also issued a Letter of Documented Verbal Reprimand to Olson on March 10, 2011, which indicated that indicated Plaintiff had fobbed into the employee entrance after her scheduled start time of 0830 hours on February 22, 23, 24, 25, and 28, 2011 and March 1, 2, 3, and 4, 2011. Plaintiff's "habitual tardiness" was in violation of General Order 87-007 II.A.10a. That Order provides:

> It is the duty and personal responsibility of each agency member to be punctual in reporting for duty at the time and place designated, except during extenuating circumstances. If an agency member is unable to report for duty because of an illness or disability, he/she shall notify SNSO no later than one hour before the starting time of the particular shift and daily thereafter, if not hospitalized.

### Alleged Stalking by Marr

At roughly the same time, Olson asserted another complaint against Deputy Darrin Marr. In her deposition, she stated that Marr came into the retail store in which Olson worked a second job. She reported that Marr "came to my Gymboree store and was stalking me there."

Asked what she meant by stalking, Olson said it was "[f]ollowing somebody around watching what they do." She felt Marr was trying to intimidate her, and was asked the basis for that belief:

Q.     Any proof to support that [belief] like a document or a witness?

A.     I don't have one at this time.

Q.     Do you expect to get one?

A. I, I can't answer that. I don't know.

Q. How would you expect to get one if you don't have one at this time if you are alleging that's the basis for why he was stalking you?

A. I don't know.

Q. But as you sit here today, you have no evidence that that was his intent, true?

A. I have no documented evidence, no.

Q. And you have no witness that will testify to that evidence or to that proposition, true?

A. I don't know what they are going to say.

In his deposition, Deputy Marr explained that he entered the Gymboree store to search for shoes for his daughter. Marr testified that he entered the store briefly, looked around the store for shoes for his daughter, did not find them, and left as soon as he realized Olson was in the store as well.

Olson reported the incident to Ostenson via e-mail on March 4, 2011, and Ostenson completed another complaint report. He attached a four-page Narrative to the Complaint Report, which included Olson's statement that Marr came into the store, stood about six feet from her, and did not say anything.

Olson submitted a Memorandum to Sheriff Barta, through Lt. Ostenson, on March 9, 2011.

The Sheriff responded on March 14, 2011

[Y]our complaint against Deputy Marr for the incident of February 27, 2011 is clearly a criminal charge of stalking. Stalking is the term that you used when you described this incident to Lieutenant Ostenson. Stalking is a felony under K.S.A. 21-3438. Thus, this is a serious matter that should be properly investigated. Shawnee County Sheriff's Office General Order # 08-001 Section III. A. requires that a Kansas Standard Offense Report shall be sent to the Kansas Bureau of Investigation. Erin, it would be inappropriate and a conflict of interest for the Sheriff's Office to conduct a criminal investigation on one of its own sworn officers. I would strongly encourage you to pursue this matter with the Topeka Police Department or the Kansas Bureau of Investigation.

Please advise when you have filed your complaint on this matter with the Topeka Police Department or the Kansas Bureau of Investigation. I look forward to your prompt response on this matter.

Olson acknowledged that Sheriff Barta encouraged her to file the stalking complaint with the Topeka Police Department or the KBI, and he has never discouraged her from doing so.

On March 24, 2011, Olson received a Memorandum from Michael George, following up on the March 14 Memorandum sent by Sheriff Barta. In the Memorandum, Mr. George told Plaintiff "stalking is a serious allegation" and posed three questions to her regarding her complaint against Deputy Marr.

Olson responded to Mr. George via e-mail on March 28, 2011, stating that her attorney was in contact with the Attorney General's Office regarding the stalking complaint and directing Mr. George to contact her attorney with any questions.

On April 1, 2011, Michael George presented a hand-delivered letter to Plaintiff's Counsel, Luanne Leeds, referencing the stalking complaint against Deputy Marr. In that letter, George inquired as to whether Olson or her attorney had reported the stalking complaint to either the Topeka Police Department or the Kansas Bureau of Investigation. George wrote:

> If I do not hear from you within the next five days, it will be necessary for the Sheriff's Office to forward the information we have received from Erin on to one of the above law enforcement agency so that this matter can be resolved. Thank you in advance for your consideration and should you have any questions, please advise.

Leeds responded to George in a letter dated April 6, 2011, indicating that she would be contacting the Attorney General's office with the complaint.

George contacted the Attorney General's Office via e-mail regarding Olson's complaint and requesting a KBI Investigation. The Attorney General declined to request KBI assistance and indicated the complaint should be reported to the Topeka Police Department.

On June 1, 2011, Olson was advised, through her attorney, that the Attorney General's office was declining to investigate the stalking complaint and indicating that the

matter should be reported to the Topeka Police Department.

Olson testified:

Q. So did you subsequent to June 1st, 2011, as requested by the Attorney General's Office for the State of Kansas report the stalking complaint concerning Darrin Marr to the Topeka Police Department?

A. I did not report it to the Topeka Police Department because they had already investigated a matter that I felt did not -- was not handled appropriately and I did not want them to look into the matter because I did not feel that it would be taken seriously and that it would get a thorough investigation. My choice at the time was to report it to the Kansas Bureau of Investigation which told me that they could not do it and then the Attorney General's Office told me they could not do it.

Q. So as it sits here today, you've done nothing since June 1, 2011, in regards to your stalking claim as it relates to Darrin Marr, correct?

A. I would not say I did not do anything. I did not file a complaint.

Q. You have not pursued it, have you?

A. No.

Q. And the Attorney General's Office is telling you the Law Enforcement Division that you need to contact is the Topeka Police Department and at this point, you refuse to do that?

A. I did not want the Police Department to look into the matter because I did not think that it would get a fair evaluation. That's why I chose not to go to them.

Q. Okay, and at this point in time, it's getting no evaluation because you've done nothing with it, true?

A. Yes, I would say that's true.

Q. And so apparently as you sit here today, no evaluation is better than an evaluation by the Topeka Police Department, correct?

A. I wanted a fair evaluation and I did not think they are going to do that for me.

On May 6, 2011, Sgt. Vest was advised by Lt. Askew that Olson had arrived late to work during the week of May 2nd while Vest was away from the Sheriff's Office for training purposes. Askew provided Vest with the key fob records for April 26 through May 6, and Vest determined that Olson had arrived after her start time on April 25, 28, and 29, and on May 2, 3, 4, 5, and 6.

Vest did not discipline or speak to Plaintiff on May 6 regarding this tardiness because Lt. Ostenson was out of the office, and Vest did not have access to the narratives

and previous discipline regarding Olson's prior tardiness. On May 9, 2011, Vest witnessed Plaintiff arrive to work five minutes late.

Vest spoke with Michael George and Lt. Ostenson regarding Olson's tardiness issues. Ostenson confirmed that he had issued a notice of intent to discipline and a verbal reprimand to Olson in March 2011. Vest reviewed the March 2011 discipline, and issued a new Notice of Intent to Discipline for the time period of April 25 to May 6. Vest testified that the purpose of the Notice of Intent to Discipline was to give "formal notification" to Plaintiff that she was going to be disciplined for her tardiness. He gave the Notice to Olson on May 9, 2011, during a meeting with which included Ostenson.

During that meeting, Vest offered to change Plaintiff's start time to 9:00 a.m., if that would help her to arrive to work on time but Olson declind the offer. At her Due Process hearing, Plaintiff acknowledged that she had been offered an opportunity to adjust her schedule and refused. Vest subsequently issued Olson a Written Reprimand on May 16, 2011.

### May 2011 CALEA Mock Assessment

A common tool law enforcement agencies use to prepare for an on-site CALEA assessment is to conduct a simulated or mock assessment. The law enforcement agency retains individuals, with knowledge of the CALEA assessment process, to come into the agency and perform an assessment. The mock assessors review the agency's documentation to determine if that documentation supports a finding that the agency is compliant with CALEA standards.

A mock assessment can assist the agency in identifying areas that might affect the agency's ability to get CALEA accreditation and to better prepare the agency for the actual CALEA accreditation process. In a typical mock assessment, an agency retains four to five individuals who are recognized within the law enforcement area as individuals who are

familiar with the CALEA accreditation process. Those individuals are scheduled to come into the agency over a three to four day period and conduct a simulated CALEA assessment.

The mock assessors' role is to identify weaknesses or areas within the agency that need to be addressed and to make recommendations to prepare the agency for the on-site CALEA assessment. In most instances, the mock assessors are placed in a conference room, provided with all of the agency's files, and then review each of the files to determine if the files contain the information necessary to comply with CALEA standards.

The Shawnee County Sheriff's Office scheduled a mock assessment for May 10, 2011. Olson and Sgt. Vest attended a meet-and-greet with the mock assessors in the staff conference room. Afterwards, Vest returned to the Accreditation and Training Unit cubicle.

Jane Pierce of the Topeka Police Department Accreditation Unit came to speak with the assessors. Olson told Pierce the mock assessors were on a tour of the agency with Undersheriff Herman Jones and Capt. Hoobler.

According to both Vest and Pierce, Olson asked, "Isn't it scary that Hoobler is representing our agency?" When Pierce did not respond to this statement, Olson said, "Hoobler is a stupid hillbilly bastard."[4]

After this comment, Pierce left and returned to the Police Department.

On the first day of the mock assessment, the mock assessors were placed in the staff conference room and were provided with the Shawnee County Sheriff's Office files and documentation for purposes of beginning their review.

During the first day of the mock assessment, Ostenson, Olson and Vest had spent

_____

[4] In her affidavit, Olson denies making this comment. But it is uncontroverted that Sheriff Barta received a credible report of the comment, and that Pierce, a female employee of an independent law enforcement agency, confirmed the comment was made. Further, while Olson now denies the statement, she made no such denial before the due process hearing, and thus Sheriff Barta was not presented with any information contradicting Pierce's version prior to Olson's termination.

time in the room with the mock assessors.

Sheriff Barta decided that he would prefer that Sheriff's Office staff not be in the room while the assessors were working, and wanted the mock assessment to closely simulate an actual CALEA assessment. He also decided that, if any of the assessors had questions, those should go through Vest, and Vest would seek Olson's help if necessary. Sheriff Barta made this decision because Vest was new to the Accreditation Manager position and needed to be involved in the assessors' questions to help prepare for an actual assessment.

Barta told Ostenson that he did not want Olson, Vest, or Ostenson in the conference room with the assessors, and did not want Olson to be present during the debriefing. Sgt. Vest, as Accreditation Manager, was to be involved in the process.

Lt. Ostenson told Vest that neither Ostenson, Vest, nor Olson would be spending any time in the conference room with the mock assessors unless there were questions. On the morning of May 11, 2011, Vest told Olson that they would not be spending time in the conference room with the mock assessors.

Olson responded that she did not care if she got in trouble anymore, and Ostenson would just have to write her up.

Ostenson later learned that Olson was in the conference room. He went there and, after she concluded her conversation with the mock assessors, told Olson he needed to talk to her. Ostenson and Olson then went into an office. Once inside, Ostenson asked Olson why she was in the room with the mock assessors.

Olson acknowledged that she had been told by Vest about her visits into the conference room, but did not believe that she could not be in there at all. Ostenson called Vest into the office, and spoke about the directive regarding her not being in the conference room.

Olson said, "I don't need a babysitter."

Ostenson explained that for purposes of the mock assessment, she was the Assistant Accreditation Manager, and Vest is the Accreditation Manager. Olson was to have no contact with the assessors without prior approval from a supervisor in her chain of command and that she would not be in attendance at the debriefing on Friday.

It is uncontroverted that Olson then raised her voice, stating she should not be babysat and told Ostenson, "I put this Goddamned program together all by myself."

Ostenson told Olson not to raise her voice or to curse at him, and that the Accreditation project was an agency effort. Olson said, "I can't believe you're doing this, John," and in an elevated voice stated, "This is bullshit; I am going to call my attorney." Continuing with an elevated voice, Olson said, "How dare you," three to four times. It was at that point Olson left the meeting.

This first meeting lasted about five minutes. After waiting about fifteen minutes, Ostenson made an overhead page over the intercom system asking Olson to contact him. He did not get a response and, after looking for her, did another overhead page.

Olson called Ostenson on the telephone. He asked her to return to the meeting, but she said she would not attend the meeting without her attorney present. Ostenson told Olson that this was an employee matter and that her attorney would not be present. Olson refused to attend. He then gave Olson a direct order to come back to the meeting. Olson hung up.

As he was leaving the office where the meeting had taken place, Ostenson saw Olson walking in his direction, and he asked if she was ready to continue the meeting. She responded that she would not unless her attorney was allowed. Ostenson said that it was an employee issue and her attorney did not need to be involved. Olson stopped in Michael George and Capt. Blume's offices before returning to the meeting with Ostenson and Vest.

In this second meeting, Ostenson again said that because Sgt. Vest was the Accreditation Manager, he would be interacting with the assessors. Olson would not be

present for the debriefing session. Towards the end of this meeting, Olson said Ostenson had violated her rights because he would not allow her attorney to be present.

It is uncontroverted that, when Ostenson disagreed, Olson yelled, "You're wrong! This is a violation of my civil rights! Look it up, John!"

Ostenson pointed out to Plaintiff that he had allowed her time to visit with her attorney. Olson replied, "Whatever, this is just retaliation and workplace harassment."

The meeting, which lasted about four minutes and was recorded, then  concluded.

Later, Olson called Vest and said she had gotten sick and would not be returning for the rest of the day. Vest later discovered Terri Neill, another employee of the Sheriff's Office, at Olson's desk. Vest believed it was inappropriate for Neill or any individual to be at Olson's desk after she had left for the day.

*Suspension, Termination, and Litigation*

The next day, Sheriff Barta issued a memorandum placing Olson on paid administrative leave. On May 17, 2011, Olson was issued a Notice of Intent to Suspend and Due Process Hearing based upon her tardiness, insubordination, and conduct unbecoming. At the same time, the Sheriff's Office issued a Notice of Intent to Terminate and Due Process Hearing.[5]

The county conducted due process hearings on May 24, 2011. Olson acknowledged that she had engaged in unprofessional behavior regarding her conduct towards Ostenson and Vest. She also admitted that she had made a "bad choice of words" during her meeting with Ostenson and Vest on May 11, and as a result of the unprofessional behavior displayed to Ostenson and Vest that she owed each an apology. Olson did not provide any

---

[5] The notice of suspension referenced Shawnee County Rule 8.2 I (punctual attendance); and General Order 87-007 § II. A. 10. a. (unbecoming conduct). The proposed termination cited the latter provision, as well as HR Policy Manual 9.5 (threatening or mistreating other employees, and insubordination).

documentation or evidence to indicate that the times she was noted to have been late to work were inaccurate. She did not dispute or identify the time entry for any individual day as incorrect.

On May 25, 2011, Olson was issued a proposed unpaid suspension for four days. Olson did not grieve the proposed suspension through the Shawnee County grievance procedure. At the same time, Olson's employment with Sheriff's Office was terminated effective May 23, 2011. Olson was terminated for "[i]nsubordination and unprofessional conduct."

On May 16, 2011, Vest spoke with Jane Pierce of the Topeka Police. Pierce told Vest to check the ATU's "proof matrix" computer file. Vest checked the computer system, and found that the"proof matrix" file had been deleted. Vest contacted Marc Price of the Shawnee County Information Technology Department, and indicated he had been unable to locate the "proof matrix" file, and that he believed the file had been deleted. Price performed a search of the system, found a back-up copy of the file, and restored it to the server.

Upon learning that the "proof matrix" was unable to be located and may have been deleted, Sheriff Barta was concerned there may have been computer tampering or a computer crime had been committed. He asked that the KBI investigate the possible computer crime.

The KBI conducted an investigation but did not find any evidence to support a criminal charge. As the Sheriff's office computer system is set up, any one of between 160 to 170 users might have deleted the file.

The Sheriff's Office did not take any action relating to this matter after the KBI closed its investigation.

Olson filed a complaint with the KHRC on May 24, 2010, stating she was alleging discrimination on the basis of sex. She filed an Amended Complaint on October 26, 2010,

adding a claim of retaliation.

### *Discipline of Similarly Situated Male Civilian Employees*

Two potentially similarly-situated male civilian employees have been identified. The first was an employee who worked in the Shawnee County Emergency Communications Center who failed to arrive at work at his scheduled time on December 14, 2009. After a December 28, 2009 due process hearing, the employee was terminated for his history of tardiness, effective December 30, 2009.

The second male civilian worked in the Shawnee County Emergency Communications Center. He was placed on Administrative Leave on September 22, 2011, as a result of his disruptive conduct in the workplace. After an investigation, the defendant issued a Notice of Intent to Discipline on October 6, 2011, indicating that termination was being considered. The Notice stated that the conduct violated HR Policy Sections 8.2 A, H, L, and 9.5 L, P, and R, as well as Sheriff's Office General Order 87-007 Sections II A.2, a, b, c, and II A.4 b. A due process hearing was held on October 10, 2011, and his employment terminated on October 12, 2011.

### *Conclusions of Law*

### *1. Spoliation of Evidence*

Before addressing the detailed arguments of the defendant in support of its summary judgment arguments,[6] the court must first address the contention advanced by

---

[6] The court notes that the defendant raises a specific and separate argument as to Olson's argument of discriminatory pay raises. The plaintiff's Response makes no attempt to explain how she suffered discrimination in her pay raises, or indeed even make reference to the subject in her argument. (Dkt. 148 at 61-74). The defendant's motion is accordingly granted on that issue.

The plaintiff does devote a portion of her Response to a section entitled "F. Mendacity," (*id.* at 72-74) in which she asserts that Hoobler, Askew and George have testified falsely, which "preclude[s] the court from considering the testimony they

the plaintiff in her Response that the court should deny summary judgment based on alleged spoliation of evidence.

This argument is premised on the fact that a new computer server was installed at the Sheriff's Office in April 2011. As the result of this switch, the network administrator in the IT department did not completely back up the old computer system.

The court finds that the plaintiff's spoliation argument fails to justify a denial of the defendant's summary judgment motion. Ordinarily, in cases of alleged spoliation, the issue should be raised as early as possible in the discovery process in order for the court to more effectively investigate, remedy, and sanction such conduct (if proven). *See Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1149 (10th Cir. 2009).

Plaintiff's Response contains no indication of any earlier effort to assert her claim of spoliation. Prior to the summary judgment response, the plaintiff filed no motion to compel or for sanctions under Rule 37. Here, the Pretrial Order indicates, without objection, "Discovery is complete." (Dkt. 122, at 26). The Pretrial Order addresses the issue only once, by indicating as one of the legal issues: "m. Whether or not defendant's failure to issue a litigation hold, and preserve and/or produce relevant evidence, entitle the Plaintiff to an adverse inference instruction" at trial. (*Id*. at 25).

"[A] party who fails to raise the issue of spoliation sanctions prior to or within the final pretrial order has waived the issue absent an explanation for the delay." *See Freeman v. Collins*, No. 2:02-71, 2014 WL 325631 *7 (S.D. Ohio, 2014) (citing *Permasteelisa CS Corp. v. Airolite Co.*, LLC, No. 2:06–569, 2008 WL 2491747, at *2–3 (S.D. Ohio June 18, 2008). In *Goodman v. Praxair Services, Inc.*, 632 F.Supp. 494, 506-08 (D. Md. 2009), the court identified

_____

offer." Olson's general argument is based on standard jury impeachment instructions, and her arguments as to the individual witnesses are purely conclusory and unsupported by the evidence. The facts before the court do not indicate any significant credibility issues as to these witnesses.

In any event, under the controlling summary judgment standard, the court independently resolves all inferences and credibility issues in favor of the plaintiff.

five factors which

> can be used to assess the timeliness of spoliation motions. First, key to the discretionary timeliness assessment of lower courts is how long after the close of discovery the relevant spoliation motion has been made. Second, a court should examine the temporal proximity between a spoliation motion and motions for summary judgment. Third, courts should be wary of any spoliation motion made on the eve of trial. Fourth, courts should consider whether there was any governing deadline for filing spoliation motions in the scheduling order issued pursuant to Fed.R.Civ.P. 16(b) or by local rule. Finally, the explanation of the moving party as to why the motion was not filed earlier should be considered.

(Citations and internal quotation marks omitted).

In the present case, discovery closed eight months before the Pretrial Order was entered. *See* Dkt. 122, at 26. Further, plaintiff advanced her spoliation argument only after the defendant moved for summary judgment. The plaintiff's spoliation argument rests primarily on the depositions of Sheriff's Office Counselor Michael George (Dkt. 148, Exh. K) and the Office's Information Technology administrator (*id.*, Exh. DDD). Both depositions occurred *nine months* before the Pretrial Order, and *more than a year* before the plaintiff's summary judgment Response. The court finds plaintiff has offered no rationale for the delay.

The plaintiff's spoliation argument is untimely under the circumstances. *See Glenn v. Scott Paper Co.*, Civ. A. No. 92–1873, 1993 WL 431161, at *17 n. 3 (D.N.J. Oct. 20, 1993) (spoliation argument in summary judgment response was untimely, where plaintiff never raised the argument "during the discovery phase or bring them to the attention of the magistrate").

Even if the argument was properly raised, it has no merit under the facts of the case. First, the court observes that the plaintiff has not identified what evidence might be missing. Reading through Olson's lengthy response, the court finds specific reference to only two pieces of allegedly missing evidence. First, Olson references an alleged email exchange between Ostenson and Vest. "Naturally," according to the Response, "the they [sic] didn't save the email." (Dkt. 148 at 20 ¶ 433). But this email would have occurred in

56

May of 2011, after the server replacement. The other evidence is an April 2010 email from Marr which Olson asserts reflects a discriminatory intent. But, accordingly to the Response, this email was already apparently lost even before Olson filed her KHRC complaint. (*Id.* at 10 ¶ 167).

Second, Olson has done nothing to show any prejudice. She responded to the defendant's 534 paragraphs of uncontroverted facts and submitted 200 paragraphs of her own. In doing so, Olson has frequently relied on electronic discovery relating to communications before and after the server replacement.[7]

Finally, the plaintiff has failed to make any showing of bad faith on the part of the defendant. The server replacement here was an independent event occurring during Olson's employment. George, the Sheriff's counsel, communicated the need to maintain evidence to various agency personnel, including Sheriff Barta, Undersheriff Holladay, Ostenson, Vest, Luttjohann, Askew, Kolbek, and Hoobler. Further, while the IT coordinator did not perform a "complete backup" of the system, the evidence establishes that the defendant maintained and provided plaintiff with a copy of her electronic mailbox as it existed at the time of the server replacement. There is no basis in the record for inferring any bad faith on the part of the defendant.

A party claiming spoliation cannot simply show negligence on the part of her opponent, nor is hypothetical prejudice sufficient for relief. *Turner,* 563 F.3d at 1149 (10th Cir. 2009); *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1407 (10th Cir. 1997). The court finds that, at most, the plaintiff has demonstrated potential negligence on the part of the defendant, and has failed to show any actual prejudice under the circumstances. Accordingly, the court denies the plaintiff's argument that the summary judgment motion must be denied

---

[7] The court cannot find prejudice with respect to the April 2010 email by Marr. Applying the relevant summary judgment standards, the court in any event assumes that Marr did in fact tell Olson that he did not want a woman as Accreditation Manager. As explained below, the court finds that this fact does not preclude summary judgment.

based on the putative spoliation.

## 2. Discrimination in Promotion

A plaintiff may establish a Title VII claim of discrimination in employment either by presenting direct proof of discriminatory intent, or indirectly through the inferential burden-shifting scheme recognized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). Under that framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. If she meets this burden, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment. If defendant does so, the burden shifts back to plaintiff to show a genuine issue of material fact whether defendant's stated reason is pretextual, that is, unworthy of belief. *Sanders v. Southwestern Bell Tel.*, 544 F.3d 1101, 1105 (10th Cir. 1997).

Olson alleges in her Complaint that the Sheriff discriminated against her on the basis of her sex when he subjected her to "discriminatory […] promotion opportunities." (Complaint ¶ 163(a)). The defendant has challenged this claim, arguing that Olson has not shown a prima facie case (because there never was an official "Civilian Accreditation Manager" position) and even if she did, the Sheriff had a legitimate rationale for refusing to promote her (that is, avoiding a grievance by the union which wanted the position reserved for its members).

In her Response, Olson complains that her claim is not that the Sheriff refused to promote her, but that she was the Accreditation Manager, and he demoted her from that position.

The court finds that the evidence does not support Olson's argument. The evidence shows, rather, that Olson was acting Accreditation Manager. She has acknowledged that the Civilian Accreditation Manager had not been defined, and she undertook that role herself by preparing a job description. She explicitly admitted that the Sheriff "must take

proper action" to advance her to the Accreditation Manager position, but that he "did not take proper action."

While Luttjohann referred to Olson as "Accreditation Manager," the uncontroverted facts establish that only the Sheriff could create a Civilian Accreditation Manager position, and he did not do so. Only the Sheriff is authorized to make personnel decisions. Because the "promotional opportunity" was never created, the plaintiff has not established the first element of a prima facie case of sex discrimination. *See Sprague v. Thorn Americas*, 129 F.3d 1355, 1362 (10th Cir. 1997).

But even if such an opportunity did exist, or the facts supported a finding that Olson was demoted from an existing position, the defendant would still be entitled to summary judgment because the Sheriff had a legitimate, non-discriminatory reason for his decision.

Shortly after the Sheriff announced his intention to create a Civilian Accreditation Manger, the FOP union sought to forestall him. The FOP Labor Counsel voted to file a grievance under its MOU, arguing that the agreement prohibited attempts to transfer to civilians jobs traditionally held by union members. It is uncontroverted that the Accreditation Manager had always been a uniformed officer, and that Olson was not otherwise qualified for the existing Sergeant Accreditation Manager position.

Olson has not shown that the Sheriff's decision not to go to war with the union over the promotion was actually a pretext for illegal discrimination. *See Sprague*, 129 F.3d at 1362. Here, there is no evidence of invidious motive by the Sheriff. Moreover, the Sheriff was the "same actor" who both sought to create the civilian position, and shortly thereafter decided to avoid a grievance with the union. In such a case there is a "strong inference that the employer's stated reason for acting against the employee is not pretextual." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006).

Olson argues Deputy Marr's alleged statement that the FOP didn't "want a female in this position" establishes pretext. But Olson has otherwise admitted that Marr was

speaking for himself. She has no evidence that the FOP Labor Council, which voted unanimously to support the grievance, was motivated by gender bias. To the contrary, the evidence shows that the union had historically grieved any attempt by the Sheriff to transfer jobs to civilians. The vote for the grievance was explicitly supported by FOP Labor Council member Detective Erin Thompson, a woman who testified she saw nothing biased in the Council's decision.

Next, Olson contends that the FOP could not file a grievance, given the time constraints in the MOU. As noted earlier, the court finds this argument is not supported by the facts, which show that the FOP had explicitly obtained permission for an extension of time to consider the issue. Olson has not shown that such an extension otherwise violated the MOU, or that the Sheriff was certain to defeat the union's subsequent grievance based on that technicality. The union presented the Sheriff with a colorable (and historically successful) grievance, and the plaintiff has failed to show that his decision to avoid a conflict with the union is pretextual.

Moreover, the decision-maker was the Sheriff, not the FOP. As noted, the FOP had historically and successfully challenged prior efforts to place civilians in positions traditionally filled by law enforcement officers. Presented with the FOP's continued adherence to this policy, the Sheriff decided not to create the Civilian Accreditation Manager position. There is nothing that shows that this decision was not grounded in a good faith effort to avoid a grievance by the union. Barta's testimony is clear and consistent that he made the decision to avoid labor strife, and nothing in the evidence shows that this desire was not honestly held or acted upon in good faith. *See Rivera v. City and County of Denver*, 356 F.3d 919, 924-25 (10th Cir. 2004). Further, the decision was approved by a neutral grievance committee.

The court finds that summary judgment is warranted as to plaintiff's claim of gender discrimination.

*3. Hostile Work Environment.*

The defendant argues in its summary judgment motion that the plaintiff's hostile work environment claim should be dismissed, contending that the five specific claims cited by the plaintiff failed to amount rise to the level of a hostile work environment. First, defendant argues that the June 2010 meeting (which Olson asserted was intimidating and in which Hoobler's voice was "gruff") and March 2011 meeting (where Olson's supervisor complained about her unwillingness to sign documents without consulting an attorney) are not related Olson's gender. Olson had otherwise agreed that she should follow the directives of superior officers, and there is no evidence that either incident was tied to Olson being female.

The defendant argues that the remaining incidents simply do not amount to severe or pervasive harassment. Olson has cited the following incidents: (1) in a bar one evening in October, 2009, Corporal Kampson, a co-worker, grabbed her buttocks; (2) Marr's alleged comment in February, 2010 that "we simply don't want a female in this position; and (3) the incident in which the insulting note was placed on her desk in May, 2010. (Dkt. 124, at 101-02).

In her Response, the plaintiff ignores these specific incidents, which were the focus of her prior workplace complaints. She makes no attempt to show that the January or June 2010 meetings were based on her gender.[8]

Instead, Olson's Response contains a brief recitation of case law, coupled with a passing reference to other events, none of which were advanced either in her response to the defendant's Statement of Uncontroverted Facts (Dkt. 148, at 3-22), or her own separate Statement of Additional Facts (*Id.* at 22-61). Such an attempt to rely on facts outside

---

[8] Olson does refer to the KBI investigation which was conducted after her employment had terminated. There is no indication that this affected her working environment (which had then terminated), or that it was based on gender.

summary judgment pleading process is improper. *See Coffey v. united States,* No. 08-0588, 2012 WL 1596916, *2 (D.N.M. 2012) (factual findings should be premised on what is set out in the fact portions of the parties pleadings). *See, e.g., Zabresky v. Von Schmeling,* No. 3:12-0020, 2014 WL 414248 (M.D. Pa. 2014) ("additional new facts" advanced by plaintiff "in his argument section ... are ... not properly before the court"); *Knuth v. Erlenbush,* 2013 WL 49797, *1 (C.D. Ill. 2013) (discounting "facts set forth in Defendant' argument section which ... are not set forth separately as undisputed facts"); *Cook v. Olathe Med. Ctr.,* No. 10-2133-KHV, 2011 WL 2690060 *2 n. 1 (D. Kan. 2011) ("The Court does not consider facts which the parties discuss only in the argument section of their briefs and not in a statement of facts"). Moreover, the additional, conclusory allegations are not supported by any proper citation to admissible evidence.

The plaintiff has failed to show any of the events were sufficiently severe and pervasive to objectively or subjectively alter the conditions of her work. *See Debord v. Mercy Health System,* 737 F.3d 642, 651 (10th Cir. 2013) ("[h]arassment has both objective and subjective components"). In determining whether conduct is harassment, the court looks to the "totality of the circumstances," including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morris v. City of Colorado Springs,* 666 F.3d 654, 664 (10th Cir. 2013) (internal quotation marks omitted).

Throughout the relevant time period, Olson did good work and received positive evaluations. In many instances, the alleged conduct was not particularly severe, as when Olson felt that Hoobler spoke to her in a "gruff" tone, when Metz "sarcastically smiled" at her, or the single instance in which Deputy Marr entered a store where she was working a second job and left without saying anything.

The vulgar message which allegedly was left on Olson's desk, however upsetting,

was a single incident in the course of Olson's three-year employment at the Sheriff's office. Taken together, the court finds that the cited incidents do not demonstrate severe or pervasive harassment. *See Morris v. City of Colorado Springs*, 666 F.3d 654, 665 (10th Cir. 2012). To the contrary, Olson has presented fewer instances of negative conduct than have otherwise been found to fall short of the objective standard for harassment. *See, e.g., Penry v. Federal Home Loan Bank*, 155 F.3d 1257, 1263 (10th Cir. 1998) (determining that incidents over three-year period were not pervasive).

Moreover, even if the incidents were deemed to rise to harassment, there is no basis under the evidence for imputing that misconduct to the Sheriff. While some of the instances of alleged harassment are attributed to Lieutenant Ostenson and Captain Hoobler, these officers — while in Olson's chain of command — were not her supervisors. A supervisor "is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State University*, ___ U.S. ___, 113 S.Ct. 2434, 2439 (2013). Here, the evidence is that only the Sheriff had the authority to make personnel decisions for Sheriff's Office employees.

An employer is not liable for the harassing acts of coworkers if it undertakes adequate remedial action. *Holmes v. Utah Dept. of Workforce Servs.*, 483 F.3d 1057, 1069 (10th Cir. 2007). The record does not discuss in detail the nature of the investigation which occurred after the alleged physical touching by harassment by Kampsen, but the evidence shows that this was a single event, not repeated in the future. Indeed, Olson did not even mention the incident in her Complaint.[9]

In addition, the Sheriff's Office conducted or supported investigations into Olson's complaints regarding Marr's alleged comment, the alleged desktop vandalism, and Ostenson's alleged harassment. Each investigation, whether by Davis or Higdon, involved

---

[9] Nor did Olson mention it in her KHRC administrative charge. As a result, she never exhausted her administrative remedies relating to the alleged incident, and the claim is not properly before the court.

the interview of multiple witnesses. Each investigation failed to corroborate Olson's claims, and in some instances was hampered when Olson did not produce physical evidence she claimed existed.

In her response, Olson asserts that the investigations, whether conducted by the Sheriff's Officer or by the Topeka Police, were "flawed." She thus refers, for example, to the "biased 'good old boy' investigation of TPD" into the alleged back door note, as well as "Askew's abusive investigation" into the Lewis complaint. (Dkt. 148, at 71). These assertions are purely conclusory, however, and are not tied to any evidence in the record.[10] The evidence does not support any claim that the investigations of either Captain Thompson or Lieutenant Askew were anything other than thorough and professional.

Thompson investigated a complaint brought by Olson, Askew a complaint brought against her. Thompson found no evidence to support Olson's claim of a back door note other than the statements of Olson and her husband, and that there were discrepancies in

---

[10] Indeed, the Argument portion of the Response cites only two incidents in its discussion of the alleged sexual harassment. First, it stresses the adoption of the new General Order which limited tape recordings of conversations with Sheriff's Office employees (Dkt. 148, at 70). Second, citing his deposition, the Response observes that the Sheriff's office did follow through with Vaughn's advice to have a surveillance system installed. (*Id.*, at 71). Neither fact indicates that the multiple investigations conducted by the Sheriff's Office were pretext. As noted elsewhere, the rule limiting tape recordings permitted some exceptions, and it appears that it was never enforced against Olson, who made at least one recording subsequent to the General Order.

The cited evidence does not show that Vaughn made any formal or written recommendation for the installation of video cameras. Instead, he observed during a meeting that, because there was "an open path around the cubicles" in which "people were free to walk in and or out as they will," only a surveillance system would be able to determine who was in a cubicle at any time. (Dep. at 13-14).

There is no evidence that Vaughn made any actual recommendation that such cameras be installed prospectively, and certainly no evidence that Vaughn or any other person considered or weighed the costs of such a system. Vaughn was simply taxed with determining who (allegedly) took Olson's tape recorder, and his point was that, given the results of his interviews, the lack of physical evidence, and the absence of a security camera system, he could not do so.

their respective descriptions of the note.[11] Askew found neighbors who directly contradicted Olson's story, stating that in her neighborhood canvas warning about Lewis she explicitly identified herself as being employed by the Sheriff's Office. Both investigations interviewed multiple witnesses and attempted to secure physical evidence where possible. There is no evidence that either investigation was abusive or improper.

### 4. Retaliation

Olson has also asserted a claim that she was subjected to retaliation based on protected activity, in violation of 42 U.S.C. § 2000e-3(a). In addition to the foregoing incidents of alleged sexual harassment, the plaintiff (in her earlier pleadings) also claimed that the retaliation manifested itself in the investigation into the Lewis incident, her reprimands for tardiness and insubordination, the missing tape recorder, the note allegedly placed on her back door, the complaints filed against her by Metz and Marr, and the post-employment investigation by the KBI.

The defendant argues that these incidents were not retaliation because they were not materially adverse. Specifically, they note Olson's email to a friend that essentially welcomed such conduct, stating that after the filing of her grievance, "[t]his can drag on as long as they want it, but as everyone already knows they settle all lawsuits. The way I look at it, I win regardless! : )"

The defendant also notes there is little basis for inferring that Olson viewed the conduct as intimidating, as she continued to file grievances throughout her employment.

Remarkably, the Response does not directly attempt to demonstrate the validity of her retaliation claim. Indeed, other than a single reference to the existence of her claim in the course of her evidence spoliation argument (Dkt. 148 at 63), the word "retaliation" does

---

[11] Olson specifically admits the defendant's Uncontroverted Fact ¶ 333, which reported Thompson's findings, including the the absence of physical evidence, and "the fact that Plaintiff and her husband ... provided inconsistent descriptions of the note."

not even appear in the argument portion of the Response.

Although numerous in number, the court finds that Olson has failed to demonstrate the incidents cited by her rise to the level of an event which would cause a reasonable worker to avoid bringing a charge of harassment. *See Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). This includes the alleged instances in which a co-worker "smiled sarcastically" at her, the action of another co-worker who entered a retail store where plaintiff worked and left without saying anything, the missing CALEA "proofs" which were apparently reconstructed and did not affect her job performance, having to attend a meeting in which a superior officer spoke in a "gruff" tone, or the filing of counter-grievances against her by co-workers that the plaintiff had charged with serious misconduct. An audio recording of the May 11, 2011 meeting conducted by Ostenson shows that the meeting was not harassing.

The plaintiff was subjected to verbal and written reprimands, but these were not material in nature because they did not themselves alter the conditions of her employement. *See Henry v. Unified School Dist. No. 503*, 329 F.Supp.2d 1130, 1159 (D. Kan. 2004) (finding under the facts that verbal and written reprimands were not adverse employment actions). The reprimands issued here were warnings issued as a part of the Sheriff's Office progressive discipline policy, but the earlier reprimands themselves did not lead to Olson's termination, or otherwise affect her work or pay. Olson never filed any grievance over the reprimands. Moreover, the uncontroverted facts support the underlaying charges, namely habitual tardiness and unprofessional conduct in acting rudely to Ostenson (on March 4, 2011) and later walking out of a first meeting and then using profanity when speaking with Ostenson and Vest (on May 11, 2011).

As to the second incident, which did play a role in Olson's termination, Olson had admitted she made a "bad choice of words" and that she had engaged in unprofessional behavior. It is uncontroverted that Olson raised her voice in the first May 11 meeting, and

yelled in the second. It is uncontroverted that Olson used profane language in the first meeting. The uncontroverted evidence shows that Olson refused to comply with direct orders to stay out of the conference room with the mock assessors, and then to meet with Ostenson without her attorney present.

The termination was also grounded in part on Olson's comments to Topeka Police accreditation officer Jane Pierce regarding one of Olson's superior officers. In a conversation which also occurred during the mock assessment, according to Pierce, Olson asked her, "Isn't it scary that Hoobler is representing our agency?" and that "Hoobler is a stupid hillbilly bastard."[12]

A reasonable employee in Olson's position could not expect to engage in such behavior with impunity, nor would she view a reprimand or termination as retaliation.

Similarly, the investigation into the Lewis complaint that she had gone door-to-door identifying him a burglar was not retaliation. The Sheriff's Office had received an independent complaint by Lewis and it was bound to investigate. The investigation was properly begun in light of the complaint, and the initial concerns of unprofessional conduct were corroborated when two neighbors directly contradicted Olson's story that she did not identify herself as a Sheriff's Office employee when she conducted her neighborhood canvas.

The alleged notes left on Olson's desk and back door are more serious, but there is absolutely nothing tying these notes to the Sheriff. That is, even assuming the truth of Olson's version of the notes, and further assuming that the notes were left by Olson's coworkers, there is still nothing showing that the Sheriff "condoned, encouraged or acquiesced in th[ose] retaliatory acts." *Hertenstein v. Kimberly Home Health Care*, 58 F.Supp.2d 1250, 1259 (D. Kan. 1999). *See Anderson v. Coors Brewing*, 181 F.3d 1171, 1178-79

---

[12] Olson now disputes making such comments, but the fact remains that Pierce, a female officer of an independent law enforcement agency, reported these comments to the Sheriff's Office.

(10th Cir. 1999).

Finally, the plaintiff has noted the existence of the KBI investigation into the circumstances of the deletion of the computer file following her termination. The investigation concluded with no result. There is no evidence that the investigation ever publicly identified Olson as a suspect, or that she otherwise suffered any adverse consequences from the investigation. As the defendant stresses, the investigation could not have materially altered her working environment, since it occurred only after her work terminated. The plaintiff provides no response to the argument in her Response.

In summary, the court finds that the defendant's summary judgment motion should be granted for the reasons provided herein. As a result, the plaintiff's Motion for Partial Summary Judgment is denied as moot.

IT IS ACCORDINGLY ORDERED this 21st day of March, 2014, that the defendant's Motion for Summary Judgment (Dkt. 123) is hereby granted. The plaintiff's Motion for Partial Summary Judgment, seeking to dismiss the affirmative defense of failure to mitigate damages (Dkt. 131) is denied as moot.


 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE